THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS BASDEN, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1335

Opinion filed May 31, 1994.—Rehearing denied August 2, 1994.—Modified opinion filed August 9, 1994.

McCORMICK, J., dissenting.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathleen F. Howlett, and Sheila MacManus, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant Thomas Basden was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1 (now codified as 720 ILCS 5/9—1 (West 1992))) and sentenced to 20 years in the custody of the Department of Corrections. On appeal, defendant contends that: (1) the court improperly instructed the jury to return a verdict on the murder charge if it found him guilty of both murder and involuntary manslaughter; (2) his right to a fair trial was prejudiced by the State's closing argument; (3) the circuit court erroneously allowed the State's expert to testify to matters beyond his expertise and made comments encouraging the jury to believe the State's expert rather than defendant's; and (4) he was rendered ineffective assistance of counsel. For reasons that follow, we affirm.

Defendant and codefendant Shawn Downey were jointly tried by a jury; codefendants Robert and Michael George were simultaneously tried by the court. At trial, the following evidence was presented. Joseph Gutierrez testified that on the afternoon of February 29, 1988, he was walking with approximately 10 of his friends, several of whom were members of the "2-6" street gang, when he saw codefendant Robert George and three other people walking towards them. George was a member of a rival street gang, the Satan Disciples, and made hand signals for the Disciples and against the 2-6. George then pulled

a gun up from his pants far enough that Gutierrez could see the handle. George then put his hand out in front of him, and Gutierrez interpreted this to mean that he would see him "later on," but admitted that it could have meant to "stay back." Gutierrez and his friends then went to an alley near Pershing Road and St. Louis Avenue, where they played basketball.

While they were playing basketball, Joe Dominguez, who was a member of the 2-6, and Juan Madrigal, who was not a member of any gang, drove up. Shortly thereafter, James Pelican, the leader of the 2-6, arrived at the alley and walked over to Dominguez and Madrigal. A blue four-door car, that Gutierrez identified as being the Buick belonging to defendant's father, pulled into the alley. The car stopped, and six or seven shots came from the passenger's side. After the shooting stopped and the car sped off, Gutierrez looked around and saw that Madrigal had been shot and was lying on the ground. Approximately two minutes later, the police arrived and took everyone to the police station.

Dr. Michael Chambliss of the Cook County medical examiner's office testified that he conducted an autopsy on Madrigal and determined that the cause of death was a gunshot wound to the head. On cross-examination, Chambliss stated the wound was "atypical" because the bullet entered Madrigal's body on the side rather than head on, something that was consistent with a ricochet.

Joseph Dominguez testified that 2-6 territory extended from 37th on Kedzie to 39th, west of Kedzie to the railroad tracks, and east of Kedzie to California. East of California was Satan Disciples territory. At the time Madrigal was killed, a feud was in progress between the 2-6 and the Satan Disciples.

At about 3 p.m. on February 29, 1988, Dominguez was in the area of 38th and St. Louis with two friends, one of whom, James "Jimbo" Pelican, was the head of the 2-6. They met Juan Madrigal, and after a 15-minute conversation, he drove Pelican and Madrigal to a restaurant 10 minutes away in Madrigal's car. Pelican and Dominguez waited outside for 30 to 40 minutes as Madrigal ate. Madrigal was not a member of the 2-6; Dominguez knew him from high school. Madrigal was a college student, and had been dating his sister, who lived with him at the time, for six years.

Dominguez then drove Madrigal and Pelican to Pelican's house at 39th and St. Louis, dropped Pelican off in front, and went to the alley behind the house where he parked Madrigal's car. From the south side of the alley he and Madrigal then watched the basketball game being played behind Anthony Medina's house. They were joined by Pelican and Pelican's two-year-old son. After about an hour and a

half, Madrigal suggested that Pelican take his son into the house, and Pelican brought the boy to say goodbye to Madrigal before going inside. When Madrigal was saying goodbye to Pelican and his son, he was a foot from Pelican. Madrigal was holding the child's hands and the child was between Madrigal and Pelican. Pelican was two or three feet away from the game, and had his back to it. Dominguez was two to three feet from Madrigal and three feet from Pelican at the time.

At that moment Dominguez heard the sound of tires on gravel, and he saw the headlights of a dark blue four-door car, which he identified as the Buick belonging to defendant's father, coming down the alley from Pershing and stopping at the "T" of the alley. He saw shots fired from the back door passenger side of the car. At that moment he, Pelican's son, and Madrigal were only four garages away from the blue car. Dominguez dropped to the ground and heard five or six shots, some louder and some softer, and the sound of tires on gravel again. He saw the back end of the blue car head toward 38th Place. Pelican had run down the alley with his son, but Madrigal was lying face down in the alley two feet from Dominguez. He was dead.

Richard Chenow testified as an expert witness in firearms identification for the State. He has been a firearms examiner in the tool-mark and firearms section of the Chicago police department crime laboratory and active in the field of firearms identification for 17 years. He examines and submits reports about all types of firearms and fired evidence, and issues receipts for them. He also examines victims' garments for gunshot residue. He has attended numerous seminars on the Federal, State, and local level on firearms identification, and has visited almost every ammunition and firearms manufacturing plant in the country. He has examined over 14,000 pieces of fired evidence, not including test firings. He was accepted as an expert in the field of firearms identification.

The basis of identification of firearms is the microscopic comparison of test firings from a firearm, and identification of the similarities in matching class and individual characteristics. Class characteristics are common to many different firearms, and individual characteristics are specific to one firearm. Chenow conducted his examination of the bullets with a microscope which magnifies $4^1/_2$ times what the naked eye can see.

Chenow testified that five casings, a bullet found in a bucket in a garage at the scene, and the bullet found in Madrigal's body were fired from the same .45 Colt automatic pistol. The two bullets sustained similar damage, in that both were flattened on one side and had linear-like scrapings and indentations on the nose, consis-

tent with striking a hard object at an angle. The bullet found in the bucket, however, had blue or gray material on its periphery, which appeared to Chenow to be paint. This indicated that the bullet had penetrated an object. Chenow found no foreign material on the bullet recovered from Madrigal's body.

In Chenow's opinion, the bullet recovered from Madrigal's body was not consistent with any ricochet bullet he has seen in 17 years. The damage to that bullet could have been caused by the bullet hitting a bony material. Chenow could not determine if the bullet was damaged in flight or after striking the victim. Generally, a bullet has more penetrating power if it strikes point first instead of striking sideways. Here, the bullets had a copper alloy jacket which made them quite a bit harder than the .45-caliber bullets that are composed of soft lead only.

There was some controversy about whether Chenow could appropriately testify to certain matters concerning the bullets. Chenow told the court that his opinion was based on information he acquired over the years about what a bullet might or might not be designed for. Outside the presence of the jury, defendant asked the court to ask Chenow if he considers himself a ballistics expert. The court responded that, because Chenow has been in the business for 17 years, it is inappropriate to suggest that he doesn't know the properties of projectiles. The court further stated:

"I'm finding him an expert. You have made your record that you do not feel he is an expert. You can examine him all you want. You can bring in as much diminution to his responses and his range of expertise if you want. I think it's ridiculous to suggest that that man who has been in the business and assembling and making weapons himself, I think it's ridiculous to suggest that he doesn't have the capacity and demonstrated expertise to talk about the capability of this bullet. I think that's absurd."

Chenow later admitted that he is not an expert on ballistics. Defendant moved to strike Chenow's testimony, and the court denied the motion.

Ricky Cataldo testified that at about 5 p.m. on February 29, 1988, he was at a hot dog stand at 35th and Western with defendant, Michael George, Robert George, and Shawn Downey. After about 20 minutes, the five walked to defendant's house at 35th and Artesian. When they arrived, defendant went inside, and Cataldo went to the alley. When he returned from the alley, the four others were standing around and talking. When he approached, they stopped talking and all five went toward defendant's father's car, a blue four-door Buick. There had been no conversation at the hot dog stand or on the way

to the alley where the shooting took place about shooting anyone. Defendant was driving, Robert George was in the front passenger seat, Shawn Downey was in the back seat behind the driver, Michael George was in the back seat behind Robert George, and Cataldo was in the back between Downey and Michael George. Defendant drove to 39th and St. Louis, at which point he drove "medium slow."

Defendant then drove to Downey's house; Downey went inside and then returned to his seat behind the driver. Defendant then drove back to 39th and St. Louis and stopped the car. At this point, Robert George and defendant switched places, with defendant in the front passenger seat and Robert George in the driver's seat. Downey and Michael George also switched places, with Downey behind defendant on the passenger side of the car. Although Cataldo had not been aware of a plot to kill anyone up to that point, he became suspicious. Robert George then turned the corner on 39th Street, heading toward the railroad tracks, while defendant rolled down the window on the passenger side of the front seat. Robert George drove to the alley, turned in, and stopped at the "T" of the alley.

Defendant then pulled a .45 automatic from his jacket and pointed the gun out the open window toward the crowd in the alley. Cataldo ducked and heard shots both from in front of him and at his side. He did not see where defendant was shooting; he could not see any people in the alley whom he could readily identify nor, from where he was seated in the car, could he hear anyone's voice in the alley. He heard three or four shots from where Downey was sitting and four to five from defendant. Robert George then pulled away, drove through the alley across 38th Place, came out on St. Louis, went to 38th Street, and turned on 38th toward the Santa Fe rail yard. At the rail yard they stopped and defendant and Robert George switched places again, so defendant was driving. Defendant drove to the K mart at 51st and Kedzie, where they dropped off Michael and Robert George. Michael George told defendant and Downey to give him the guns and they did so. Cataldo had seen both guns, the .45 fired by defendant and the .22 fired by Downey, previously, when he had been in their company. When defendant dropped him off at his house, Cataldo told his mother what had happened, but neither he nor his mother contacted the police.

Defendant and the State stipulated that Chicago police officer Reynolds, an evidence technician, would testify that on February 29, 1988, he was in the company of his partner, Chicago police officer McHugh. He spoke with Chicago police detective Kill and observed Madrigal's body. Upon examining the body, he observed a gunshot wound to the left side of the head. The distance from the body to the

T-section in the alley was approximately 100 feet. There was a bullet hole about six inches above the ground in a garage door 60 to 65 feet from the "T" in the alley. Inside a bucket in the garage, about five feet from the garage door, was a spent .45-caliber bullet. In the west wall of the garage, located about 50 to 55 feet from the alley "T," Reynolds discovered another bullet hole, approximately four feet above the ground. Finally, Reynolds recovered one spent casing from a citizen named Trevino.

Officer James Spratte of the Chicago police department, a gang crimes specialist, testified that a gang sign flashed upside down by a member of another gang means "death to that gang." The area around 38th and St. Louis is the territory of the 2-6 gang, and directly to the east is the territory of the Satan Disciples. On February 29, 1988, the two gangs were "at war." The primary hand sign of the 2-6 gang was the Playboy bunny, and the primary hand sign of the Satan Disciples was the "devil pitchforks." The colors of the 2-6 were black and tan; the Satan Disciples wore black and canary yellow. James Pelican was the leader of the 2-6, and the second in command was Ramon Rocha.

After running the license plate of the blue car through his computer and ascertaining that it was registered to defendant's father, Spratte and his partners went to defendant's house. They placed defendant in the back seat of their squad car and read him his *Miranda* rights. Defendant indicated he understood his rights and that he would answer questions at that time. Defendant denied knowledge of the shooting.

While on the way to the Area 3 Violent Crimes office, however, defendant admitted that he was there and said that he was the driver and that Robert George had done the shooting. He said that Michael George and Ricky Cataldo were also in the car. Spratte informed his partners of what defendant had told him and went to pick up Ricky Cataldo. Later, he and his partners picked up Shawn Downey, whom Spratte identified in court.

Spratte read Downey his *Miranda* rights, and Downey indicated that he understood them. He transported Downey to the Area 3 office and placed him in an interview room. He then informed Detective Kill that Downey was in the room. Previously, Downey and defendant had indicated to Spratte that they were members of the Satan Disciples.

Detective Michael Kill testified that he and his partner were westbound on 39th Street near Kedzie at about 6:55 p.m. on February 29, 1988, when they responded to a call of a man shot. He found Madrigal in the alley at 3542 W. Pershing, 100 feet from the "T"

section of the alley, and unsuccessfully attempted first aid. He discovered a large-caliber bullet hole behind Madrigal's left ear. After speaking with witnesses, Kill proceeded westbound through the alley, past the last house, where at 3552 W. Pershing he observed four .45-caliber shell casings on the ground.

Madrigal's car was parked facing westbound on the north side of the alley before the "T." Kill observed an indentation on the car, 12 inches to the right of the left front fender and one inch above the left headlight bracket. The left front tire of the car was flat.

Kill described the bullet hole found in the garage door as an elongated, backwards "D" shape, which appeared to him to be caused by a bullet striking at an angle. He recovered no .22-caliber bullets or casings.

Kill returned to Area 3 at 8 p.m. and began interviewing witnesses. At around 8:30 p.m., Kill spoke with Spratte who, accompanied by other officers, then went looking for Robert and Michael George and a blue, full-sized GM car. They returned with defendant and Shawn Downey.

At about 11 p.m., Kill had a conversation with defendant. He advised him again of his *Miranda* rights, and defendant indicated that he understood them. Kill told defendant that he had had conversations with Ramon Rocha and Ricky Cataldo, and that he wanted to talk to him about the switching of places in the car while it was parked at 39th and St. Louis. Defendant then related the story of the entire incident. He had a .45-caliber semiautomatic pistol, and Downey wanted to go home to pick up a .22-caliber revolver. He told of switching places in the car, and related how he fired five or six times and how Downey fired four or five times down the alley. He said that Robert George took the .45-caliber pistol with him when he left the car, and Michael George took the .22-caliber revolver with him. He stated that Cataldo had nothing to do with the planning or the execution of the shooting.

After interviewing defendant, Kill notified the felony review unit of the State's Attorney's office and then interviewed Downey. He advised Downey of his *Miranda* rights, and Downey indicated that he understood them and agreed to speak with him. Downey then related the entire story. The only differences from defendant's story were that Downey said he had the .22-caliber revolver with him before he went home (he had gone home merely to pick up a pack of cigarettes); Downey fired only three shots; and he heard defendant fire four to five shots. Downey said that the shooting was the result of on-the-spot planning among the four defendants; defendant had not said when the shooting was planned. Downey also said that Cataldo was

not involved in the planning or the commission of the shooting. Kill was present for part of the assistant State's Attorney's questioning of both Downey and defendant, and he was present when statements to a court reporter from both were taken. Kill signed both statements as a witness.

Former Assistant State's Attorney Larry Axelrood testified that he separately read defendant and Downey their rights, and took separate statements to a court reporter from each at around 3 a.m. Defendant related that after he got his father's car, he and his codefendants went driving in the area of 39th and St. Louis to see if they could find any members of the 2-6 gang. They saw the people playing basketball in the alley on their first pass through the area, and went down 39th Street to see if they could identify them. They saw that the people in the alley were members of the 2-6 gang, and then went to Downey's house, where Downey got the .22-caliber revolver. Defendant already had his .45 with him. The .22 belonged to Michael George, but was carried by Downey. They returned to the area, and he and Downey switched places with Robert George and Michael George at 39th and St. Louis.

When Robert George turned the corner by the "T" of the alley, he slowed down and defendant and Downey started firing. Defendant was shooting at a car, and Downey was shooting at the crowd. Defendant fired four or five shots, but did not know how many Downey fired. Defendant and Robert George switched places again after leaving the alley, and defendant drove down Fire Road across 47th, then across Archer and east of Lawndale, then to 51st and Kedzie. At this point the Georges took the guns and got out of the car. Defendant took Cataldo home, then drove Downey home.

Downey told Axelrood that when they went to the area of 38th and St. Louis, he had his .22-caliber revolver and defendant had his .45. He returned home to get a pack of cigarettes. When they returned to the area, they saw some 2-6 gang members in the alley, and drove around the block discussing whether they should "jump" them (engage in a fist fight). Someone said that since they had guns they should just shoot, but Downey did not know who said it. After he and defendant switched seats with the Georges, they drove into the alley, slowed down at the "T," and pointed the guns out the window. Downey aimed a little high because he didn't want to hurt anyone. He fired three or four times toward the people in the alley, trying to aim above their heads. Defendant fired three or four times, trying to aim at a white car parked in the alley. As they drove out of the alley, Robert George was not driving too well so defendant took over, dropping off the Georges, with the weapons, at the K mart on Kedzie.

Downey and defendant then drove Cataldo home, and then defendant dropped Downey at his house.

Following Axelrood's testimony, the State rested its case in chief.

Robert Boese testified for the defense as an expert witness. Boese is the president and director of B&W Consulting Forensic Chemists, and he previously worked for 28 years for the Chicago police crime laboratory. He has examined 25,000 casings from various types of bullet sizes and shapes, 12,000 to 15,000 weapons, and has testified approximately 150 times. He was accepted as an expert in firearms identification.[1]

Boese examined both the bullet recovered from the body and the bullet found in the bucket in the garage. He microscopically examined both bullets using a stereo binocular microscope, which allows magnification up to 60 to 70 times normal eye power. Then, using a fine platinum wire, and while viewing the bullets microscopically, he collected material embedded in the striations on the sides of both bullets and examined that material under a polarizing light microscope, which magnifies 400 times.

Boese determined that both bullets had striations or shearing action on one side, indicating that the bullet had struck a hard object. On the bullet recovered from the body, there was also a small indentation on the opposite side from the shearing action. Small pieces of tissue-like paper and mineral similar to stone or asphalt were recovered from the bullet found in the body. Boese testified that the recovery of the paper was consistent with the bullet having been wiped with tissue. A similar material and paint were embedded in the bullet found in the pail. Boese performed no chemical tests to determine the nature of the foreign substances recovered from the bullets.

In Boese's opinion, the striations to the sides of the bullets were caused when the bullets struck a harder object or surface while moving forward. When a bullet is fired it spins on its axis, but when it is sheared it cannot move forward and rotate but changes course and begins to tumble. The bullet recovered from the bucket came into contact with a painted surface and also hit something mineral in nature. The bullet recovered from the body hit at least two objects, one a very hard surface and the other a much softer material, but one which had enough resistance to deform the bullet. In his opinion, that bullet struck a very hard object before it entered the body.

---

[1]The court apparently inadvertently used the word "witness" instead of "expert," but Boese was qualified as an expert and treated like an expert. He gave opinion testimony.

Boese could not determine at what time in the bullet's flight the deformity occurred; there could be a half-dozen possibilities as to what it had struck.

If the gun had been dropped on some type of rock material, one could probably find the type of rock material found on the bullet in the first few millimeters of the gun barrel. The damage on the bullet could not be caused by the normal firing of the weapon. Boese admitted on cross-examination that he did not examine any gun as part of his analysis in this case.

After closing arguments, the court submitted the following among its instructions to the jury:

"When you retire to the jury room you will first elect one of your members as your foreperson. He or she will preside during your deliberations on your verdict.

Your agreement on a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.

The defendants are charged with the offense of first degree murder. Under the law, a person charged with first degree murder may be found not guilty, or may be found guilty of first degree murder, or guilty of involuntary manslaughter.

You are to decide based upon the evidence and the law in this case as to each defendant whether to return a verdict of not guilty, a verdict of guilty of first degree murder, or a verdict of guilty of involuntary manslaughter.

Accordingly, you will be provided with three verdict forms as to each defendant: 'not guilty,' '[g]uilty of first degree murder,' and 'guilty of involuntary manslaughter.'

From these three verdict forms, you should select the one verdict form that reflects your verdict as to each defendant and sign it as I have stated. Do not write on the other two verdict forms as to that defendant. Sign only one of these verdict forms as to each defendant.

If you find the State has proved the defendant guilty of both first degree murder and involuntary manslaughter, you should select the verdict form finding the defendant guilty of first degree murder and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of involuntary manslaughter."

The court gave the following instruction to the jury with respect to the issue of accountability:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an

offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

The court also read to the jury instructions defining the offense of first degree murder and the propositions that the State must prove to sustain that charge, and instructions defining the offense of involuntary manslaughter and the propositions the State must prove to sustain that charge.

The jury returned a verdict finding defendant guilty of first degree murder. The court sentenced him to the minimum sentence, a term of imprisonment of 20 years. Defendant now appeals.

I

Defendant first asserts that he was denied his sixth and fourteenth amendment rights to due process and trial by jury when the court instructed the jury that if it found him guilty of both first degree murder and manslaughter, it should return a verdict of guilty of first degree murder only. Because this instruction permitted the jury to convict defendant of murder despite a finding that he possessed a mental state inconsistent with that offense, defendant asserts, this court should order a new trial.

The State responds that defendant received a fair trial because the instructions tendered to the jury were complete and in accordance with Illinois Pattern Jury Instructions, Criminal (2d ed. Supp. 1989) (IPI Criminal 2d (Supp. 1989)) and the relevant statutes.

The court instructed the jury that, in order to sustain the charge of first degree murder, it must find that the defendant performed the act which caused Madrigal's death, and that defendant intended to kill or do great bodily harm to Madrigal or another, or that he knew his acts would cause death to Madrigal or another, or that he knew his acts created a strong probability of death or great bodily harm to Madrigal or another. The court also instructed the jury that defendant could be found not guilty; or guilty of first degree murder; or guilty of involuntary manslaughter. It clearly directed the jury to select the one verdict form that reflected its verdict. The judge told the jurors not to write on the other two forms; they were to "[s]ign only one."

The court then accurately read the jury IPI Criminal 2d No. 26.01Q (Supp. 1989), proposed by defendant himself, which concludes:

"If you find the State has proved the defendant guilty of both first degree murder and involuntary manslaughter, you should select the verdict form finding the defendant guilty of first degree murder and sign it as I have stated. Under these circumstances,

do not sign the verdict form finding the defendant·not guilty of involuntary manslaughter."

The circuit court has a duty to instruct the jury as to the law, and this includes defining the offense in language sufficient to inform it as to the elements of the offense charged and what facts are necessary for proof. *People v. Davis* (1966), 74 Ill. App. 2d 450, 454, 221 N.E.2d 63.

■ Murder and the included offense of involuntary manslaughter are distinguished only in terms of the mental state required. Murder requires the intent to kill or do great bodily harm, or knowledge that the acts committed create a strong probability of such result, while involuntary manslaughter requires only reckless conduct which is likely to cause death or great bodily harm. Involuntary manslaughter is an included offense of murder because it involves the unintentional killing of a human being without lawful justification while recklessly performing acts which are likely to cause death or great bodily harm. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 194-95, 478 N.E.2d 335, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139; *People v. Whitt* (1986), 140 Ill. App. 3d 42, 49, 487 N.E.2d 1246.) A defendant must be retried when the jury returns verdicts finding him simultaneously guilty of offenses requiring legally inconsistent mental states. *Hoffer*, 106 Ill. 2d at 194-95.

Here, the jury was properly instructed on the offense charged, first degree murder, and also instructed on the included offense of involuntary manslaughter. The court clearly informed the jury members that they must select the one verdict form that reflected their verdict. The jury did so, returning only one verdict form reflecting its finding that defendant was guilty of first degree murder.

This case is distinguishable from *Hoffer*, where the jury was not informed that it could return a verdict form on only one of the offenses, and it returned three verdict forms, finding the defendant guilty of murder, voluntary manslaughter, and involuntary manslaughter. The court reasoned that because the mental states of murder and manslaughter are mutually inconsistent, by finding the defendant guilty of both the jury returned verdicts that were legally and logically inconsistent, requiring reversal. *Hoffer*, 106 Ill. 2d at 189-95.

Further, the instruction at issue was tendered by defendant himself; he therefore waived this issue. (*People v. Tucker* (1993), 245 Ill. App. 3d 722, 730, 614 N.E.2d 1265.) This issue could also be considered waived because defendant failed to include it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Where an instruction is challenged for the first time on appeal,

it is the charge of the reviewing court to determine whether the defect is a substantial one that rises to the level of plain error. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 222, 429 N.E.2d 861.) Generally, a waived instruction error may be noticed on appeal even if it was the defendant who caused the instruction to go to the jury, if it so affects the defendant's substantial rights that it rises to the level of plain error. *People v. Sanders* (1984), 129 Ill. App. 3d 552, 562-63, 472 N.E.2d 1156.

The plain error exception to the waiver doctrine is included in Illinois Supreme Court Rule 615(a), which states:

"Rule 615. The Cause on Appeal

(a) Insubstantial and Substantial Errors on Appeal. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (134 Ill. 2d R. 615(a).)

This plain error exception "occurs only when a defendant is deprived of a substantial right, and thus is deprived of a fair trial, or when an error is made in a case with closely balanced evidence" (*People v. Bean* (1990), 137 Ill. 2d 65, 80, 560 N.E.2d 258, *cert. denied* (1991), 499 U.S. 932, 113 L. Ed. 2d 270, 111 S. Ct. 1338), which raises doubt as to the effect of the error on the jury's verdict.

Defendant cites *People v. Summers* (1990), 202 Ill. App. 3d 1, 14, 559 N.E.2d 1133, *appeal denied* (1990), 135 Ill. 2d 565, 564 N.E.2d 846, for the proposition that the jury instruction at issue here should not have been given because a jury cannot properly find the offenses of murder and involuntary manslaughter to exist simultaneously. The appellate court found that the instruction misstates the law. (*Summers*, 202 Ill. App. 3d at 12-14.) The court found the error to be harmless, however, because the circuit court immediately after giving the instruction explained the proper procedure for the jury to follow; namely, if the jury found the defendant guilty of involuntary manslaughter, the jury could not also find him guilty of murder. (*Summers*, 202 Ill. App. 3d at 16.) The prosecutor also explained in closing argument that the offenses were mutually exclusive. (*Summers*, 202 Ill. App. 3d at 16.) Additionally, the record in *Summers* contained no indication that the jury found that the State had proved the defendant guilty of both offenses. *Summers*, 202 Ill. App. 3d at 16.

The court's reasoning was adopted by another district of the appellate court in *People v. Tucker* (1993), 245 Ill. App. 3d 722, 614 N.E.2d 1265. In *Tucker*, however, the court found that the instruction did not rise to the level of plain error because the prosecutor, in closing argument, explained the difference between an act that is

knowing and intentional and an act that is reckless, the prosecutor asked for a verdict of guilty of first degree murder, and there was no indication that the jury actually found the defendant guilty of both murder and involuntary manslaughter. The court did not clarify its instruction immediately after giving it, but the reviewing court found that this was not necessary. *Tucker*, 245 Ill. App. 3d at 730-31.

■ We agree with the appellate court in *Summers* and *Tucker* that the giving of the last part of this instruction was error. In this case, however, counsel for both the State and the defense made several references in closing argument to the distinguishing elements the jury must find in order to convict defendant either of murder (intent) or involuntary manslaughter (recklessness). Defendant's attorney took great pains to characterize the case as a "classic case of involuntary manslaughter." In response, the prosecutor attempted to clear up any possible confusion the jury might have about what constitutes reckless behavior and what, in contrast, constitutes intentional behavior. As in *Tucker*, the prosecutor here asked the jury to convict defendant of murder. As in *Summers* and especially in *Tucker*, in this case there was more than sufficient clarification of the allegedly erroneous instruction. Also, as in both cases, here there is

> "no indication that the jury *in fact* ever found that the State had proved defendant guilty of *both* first degree murder and involuntary manslaughter, thereby causing the erroneous portion of IPI Criminal 2d No. 26.01Q (Supp. 1989) to be activated." (Emphasis in original.) *Summers*, 202 Ill. App. 3d at 16.

Additionally, in order to prove the requisite state of mind, the State was required to show only that defendant voluntarily and willfully intended to fire a gun and then pointed it and shot in the general direction of the victim. (*People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829.) Such evidence is sufficient to strip a defendant of any right to an instruction on involuntary manslaughter.

At trial, defendant made no claim that he had attempted to shoot down into the ground or up in the air. On the contrary, by defendant's own admission, he and his friends went looking for members of the opposing gang, found them, and then he deliberately fired his gun at the car four or five times. The physical evidence introduced at trial further established that defendant's bullets struck not only the car but also the garage across the alley from the car. Codefendant Downey said in his statement that he had been "trying to aim above their heads." Defendant said in his statement that he "was shooting at the car and Shawn [Downey] was shooting in the crowd." Defendant's own statement provides adequate proof of the requisite intent for murder. Because the jury was properly instructed that a

statement made by one defendant could not be considered against another, the only substantive evidence before the jury concerning any shooter's statement of intent was defendant's, a statement fully demonstrating the intent element of murder and therefore inconsistent with involuntary manslaughter.

Thus, the record makes it clear that defendant acted voluntarily and willfully when he pulled the trigger and shot in the general direction of Madrigal. As in *Cannon*, therefore, there is no doubt that the State satisfied its burden of establishing defendant's state of mind under at least one of the three definitions of murder. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2) (now 720 ILCS 5/9—1(a)(2) (West 1992)).

Finally, instructions in criminal cases must be read as a whole when challenged on appeal. " 'It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the People and the defense.' " (*People v. Terry* (1984), 99 Ill. 2d 508, 516, 460 N.E.2d 746, quoting *People v. Kolep* (1963), 29 Ill. 2d 116, 125, 193 N.E.2d 753.) When read in context with the other instructions in this case, the instruction was sufficiently clarified, and any error was rendered harmless.

Because any possible confusion caused by the challenged jury instruction was clarified by the instructions when taken as a whole, and by the comments of the attorneys in closing argument, following *Tucker* we find that the error caused by giving the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) does not rise to the level of plain error. We therefore decline to accept defendant's suggestion that we reverse and remand for a new trial.

## II

Defendant next asserts that arguments by the prosecutor relieved the State of its burden to prove that he possessed the requisite mental state to support a conviction for murder and thus denied him due process of law. The State responds that defendant has waived this issue because he failed to preserve it for appeal, and because the alleged error does not rise to the level of plain error.

As a general rule, failure to object to an alleged error at trial and in a written post-trial motion results in a waiver of that error on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) In this case, defendant failed to include his contention that the prosecutor's closing argument was prejudicial in his post-trial motion.

The plain error exception to the waiver doctrine was discussed in

section I above. Because defendant waived this issue by his failure to include it in his post-trial motion, we may reach this issue only if we find that it amounts to "plain error."

The State gave a single closing argument for both defendant and codefendant Downey. After arguing that defendant was directly guilty of murder because the evidence showed that he caused the death, the first prosecutor argued that Downey was guilty as an accomplice accountable for defendant's act:

> "The accountability language, the language which I read to you earlier which indicates that a person is responsible for the acts of another individual, they are engaged in a common criminal design or agreement and they take acts which are an inference of that design is considered to be an act of all the individuals which took place or agreed on that plan.
>
> They are equally responsible for the consequences of those acts.
>
> One who assists another in the planning or the commission, Ladies and Gentlemen, of an offense is legally accountable, legally responsible for the conduct of the person who he aids.
>
> The word 'conduct,' Ladies and Gentlemen, encompasses any criminal act. Again, Ladies and Gentlemen, if these two people went there with the sole purpose, for the sake of argument, just to beat up those people and Juan Madrigal was killed in the process, they are guilty of murder under the law."

At this point, defendant objected, and his objection was sustained. The last portion of the statement was stricken. The prosecutor continued:

> "The deaths are probable for each other's comments [sic]. They are responsible, Ladies and Gentlemen, because there was a common plan, scheme or a design.
>
> The circumstantial evidence in this case, Ladies and Gentlemen, indicates that there was a common scheme, plan, or design, and that the two Defendants were the participants in that particular plan."

In rebuttal argument, the other prosecutor, discussing defendant's statement as proof that he intended to kill, stated that defendant knew "where they were going. They were going after the two-sixes." He then went on to discuss the guilt of Downey:

> "Now, Ladies and Gentlemen, as [the first prosecutor] told you, a person is legally responsible for the acts of another when either before or during the commission of an offense, and I want to emphasize an offense, with the intent to provoke or facilitate the commission of an offense, he knowingly solicits, abets, agrees to aid, or attempts to aid the other——."

At this point, codefendant Downey objected to the fact that the

prosecutor referred to "an offense." The court overruled the objection, and the following occurred:

"[PROSECUTOR]: He attempts to aid the other person in the planning or commission of an offense.

It doesn't mean that the offense of murder—if they go out to commit an armed battery, go out to scare someone—

[COUNSEL FOR DOWNEY]: Objection.

[COUNSEL FOR DEFENDANT]: Objection. He is arguing the law.

THE COURT: This jury will be properly instructed by this Court. They also know what the evidence is. Proceed, Mr. [Prosecutor].

[PROSECUTOR]: They go out to scare someone. They go out to commit a battery against someone.

[COUNSEL FOR DOWNEY]: Objection.

[PROSECUTOR]: They are guilty for all—

[COUNSEL FOR DOWNEY]: Objection.

[COUNSEL FOR DEFENDANT]:

Objection as to 'battery.'

THE COURT: Counsel, this is argument. Overruled.

[COUNSEL FOR DEFENDANT]: Battery is a legal conclusion.

THE COURT: I have ruled and I don't intend to argue with you about it. Thank you. Go ahead, Mr. [Prosecutor].

[PROSECUTOR]: That means they are responsible for whatever acts are done in furtherance of that.

So it doesn't matter if it was in Shawn Downey's mind, Michael George's, or Robert George's, or whatever. They go out there to roll on some two-six boys. They are guilty of murder. If one of them goes afield of that, that's the way the law is. It's uniquely ta[i]lored for this type of gang-related act.

[COUNSEL FOR DOWNEY]: Objection.

THE COURT: Overruled. Counsel invited that comment by talking about what the law was uniquely ta[i]lored to do.

[COUNSEL FOR DEFENDANT]: I didn't say 'uniquely.'

THE COURT: Counsel, please do not argue with me. I heard exactly what you said.

I contend that he is now going to finish his last two minutes without any further objection. Proceed, Mr. [Prosecutor].

[PROSECUTOR]: This law is uniquely ta[i]lored for these gang-bangers when they get together in groups. They go well into a rival gangster's territory motivated by prior incidents between a leader of that gang, and the George boys were motivated by an earlier incident that happened that day where they threw down gang signs and a sign of disrespect.

Officer Spratte told you about that. That means death.

Look at the whole picture, Ladies and Gentlemen. That's why they went over there. To hurt somebody; to kill somebody; to go after rival gang members."

After closing arguments, the court gave the following accountability instruction to the jury:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

This instruction has been held by the Illinois Supreme Court to accurately state the law on accountability. (*People v. Caballero* (1984), 102 Ill. 2d 23, 42, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Terry* (1984), 99 Ill. 2d 508, 515, 460 N.E.2d 746 (defendants guilty of murder under common design rule, where they had agreed to commit the offense of battery, and in the course of the commission of that offense, a murder was committed).) The law on accountability incorporates the common design rule, which provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of the design by any one party are considered to be the acts of all parties to the common design, and all are accountable for those acts. (*Terry*, 99 Ill. 2d at 514.) Further, proof of the common purpose need not be supported by words of agreement or direct evidence, but can be drawn from the circumstances surrounding the commission of an act by a group. *People v. Cawley* (1979), 77 Ill. App. 3d 780, 784, 396 N.E.2d 865.

Here, the prosecutors told the jury in final argument that, because codefendant Downey was engaged in a common criminal design, he could be held accountable for the victim's death as a result of his participation in a scheme to attack the rival gang members. These arguments were proper and based on reasonable inferences from the evidence.

As to this defendant, however, it is his own conduct, not that of his codefendants, for which he is held accountable. In order for the jury to convict him of murder, the State had to prove that he acted while possessing the requisite mental state. It would have been error for the prosecutor to argue that this defendant's mental state could be inferred from the conduct of his companions. But the prosecutor never invited the jury to apply the law of accountability when deciding this defendant's guilt or innocence. He expressly listed the names of the codefendants to whom that portion of the argument would apply: Shawn Downey, Michael George, and Robert George. Defendant's name is conspicuously absent from this list. Viewed in

context, the prosecutor's remark was clearly intended solely to inform the jury of how codefendants Downey and the Georges could be found guilty of murder even though defendant alone had fired the fatal shot.

█ Defendant's argument that the State created the impression on two occasions during its argument that he could be convicted of murder, even though he may not have acted with the intent to kill, or to do great bodily harm to another, or with knowledge that his acts created a strong probability of death or great bodily harm to another, on the theory that he was accountable for the mental state of his accomplices, is simply not persuasive. When he began talking about the law of accountability, the prosecutor was addressing the guilt of the other defendants in the case, having just argued that the fact that the shooters fired at people near the house of the leader of the rival gang demonstrated the intent necessary for murder.

Additionally, the circuit court instructed the jury that it was required to follow the court's instructions as to the applicable law. It also painstakingly reviewed the elements of each offense. The accountability instruction itself makes it plain that it applies only to those who are vicariously liable for a crime, not to those who actually commit the offense. To have found defendant guilty on a theory of accountability, the jury would have had to ignore the court's instructions altogether.[2]

Consequently, the prosecutor's explanation of the law of accountability in closing argument did not deprive defendant of a fair trial.

---

[2]The dissent asserts that the prosecutor's argument "implicitly invited the jurors to apply the law of accountability when deciding defendant's guilt or innocence, particularly for deciding whether defendant met the mental state requirement for murder." (264 Ill. App. 3d at 554.) As indicated above, however, the prosecutor explicitly omitted defendant's name from the list of those to whom accountability would apply.

The dissent also asserts that we do not "suggest why the prosecutor needed to argue the guilt of the Georges to the jury." (264 Ill. App. 3d at 554.) In that the dissent is correct. We are under no obligation, however, to do so. The prosecutor properly argued the guilt of codefendant Downey to the jury, and in doing so he properly discussed the law of accountability. The fact that the Georges were also guilty under an accountability theory is irrelevant. The prosecutor would have been wrong to argue defendant's guilt on a theory of accountability, but he did not do so.

Despite the dissent's assertions, there is no evidence that the jury was at all confused about the mental state required to find defendant guilty of murder.

We therefore find no plain error, and thus no reason to depart from the waiver doctrine.

### III

Defendant next asserts that the admission of expert testimony offered by the State to refute the defense theory of innocence denied him due process where the prosecution failed to qualify its witness as an expert. Further, defendant asserts, the prejudice from this alleged error was magnified, and independent error created, by the circuit court's comments in the presence of the jury displaying favor toward the State's expert witness, in contrast with the court's treatment of the defense expert.

The State responds that defendant received a fair trial because it qualified its witness as an expert and the court properly admitted his expert testimony, and because the court treated both expert witnesses appropriately. Alternatively, the State argues that defendant waived this issue by failing to object at trial and by failing to include the issue in his post-trial motion.

Defendant failed to object at the time the State's expert witness was qualified and accepted as an expert by the court. Defendant also failed to object to the judge's allegedly favorable comments toward the State's expert, and to the judge's inadvertent use of the word "witness" instead of the word "expert" when the defense expert was qualified and accepted by the court. Further, defendant failed to file a post-trial motion concerning these alleged errors.

Defendant argues, however, that the failure to object to these alleged errors presents no impediment to their being noticed by this court. This is the case, defendant asserts, because this court may apply the rule of waiver less strictly where the objectionable conduct is that of the trial judge. Defendant cites *People v. Mays* (1989), 188 Ill. App. 3d 974, 983, 544 N.E.2d 1264, in support of this argument.

In *Mays*, during cross-examination of a prosecution witness, according to the court reporter, who testified that she was startled by his actions, the trial judge in the presence of the jury slammed down his pencil, heaved a sigh, and made facial gestures in response to a question posed by defense counsel. He displayed obvious anger. The appellate court held that the defendant may have been prejudiced in the eyes of the jury by the judge's actions and remanded the cause for a new trial. (*Mays*, 188 Ill. App. 3d at 985.) Also, at a hearing on the defendant's motion for a new trial, defense counsel stated that at least six jurors took note of and made an obvious response to the judge's actions. *Mays*, 188 Ill. App. 3d at 984.

This case is clearly distinguishable from *Mays*. Here, the trial

judge merely allowed the State's expert to explain his opinion of the mutilation and foreign materials on the bullets. The court did this for "expeditious" reasons and to give the witness the opportunity to explain to the jury what to look at in terms of the shape of the bullets. Twice the judge told defendant's counsel that he would be able to cross-examine the expert fully. We do not believe that these comments by the judge could have prejudiced the defendant the way the judge's actions prejudiced the defendant in *Mays*.

■ Defendant further asserts that this court should apply the plain error rule (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274), because the evidence related to the central issue in the case was closely balanced. According to defendant, that central issue is whether the bullet that hit and killed the victim was or was not a ricochet bullet. However, we believe that the central issue in the case is whether or not defendant possessed the intent necessary for murder. Whether or not the bullet found in Madrigal's skull was a ricochet bullet is not significant to the jury's finding of intent. The evidence regarding intent is not closely balanced at all. The jury could certainly have reasonably inferred that defendant and his codefendants planned to shoot at the rival gang members in the alley. The evidence of witnesses Gutierrez, Dominguez, and especially Cataldo makes the question of defendant's intent very clear. The jury had only defendant's and a codefendant's statements to an assistant State's Attorney at the time of their arrest that when defendant shot into an alley containing 15 to 20 persons he had aimed at a car and not at the people to balance against all the other evidence of intent.

Because the evidence regarding defendant's intent is not closely balanced, and because defendant was not deprived of a substantial right, we decline to apply the plain error exception to the waiver doctrine.

## IV

Finally, defendant asserts almost as an afterthought that defense counsel was ineffective in failing to tender the proper jury instruction regarding the mutual exclusivity of findings of guilty of first degree murder and guilty of involuntary manslaughter. Because the omission affected the jury's ability to resolve the only factual issue in dispute, namely, defendant's intent, defendant asserts this error so prejudiced the defense as to deny defendant his right to a fair trial. The State responds that defendant received a fair trial where counsel tendered the correct instruction, or where, if there was error, it did not alter the outcome of the trial.

To determine whether a defendant has received ineffective assistance of counsel, the issue is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. (*Strickland. v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Defendant must show: (1) that counsel's performance was seriously deficient, and (2) that but for those unprofessional errors, there was a reasonable probability that a finding of not guilty would have been the result at trial. *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.

Defendant cites *People v. Pegram* (1988), 124 Ill. 2d 166, 529 N.E.2d 506, in support of his argument that he received ineffective assistance of counsel. In *Pegram*, defense counsel failed to tender either an instruction on the affirmative defense of compulsion or on the State's burden of proof where the defense of compulsion is raised. In finding that these omissions constituted ineffective assistance of counsel, the court reasoned that the missing instructions were critical. This was the case because the defendant raised the defense of compulsion and the court believed that the jury, therefore, should have been instructed on the defense and on the State's burden of proof regarding it. (*Pegram*, 124 Ill. 2d at 172.) Because this omission was so grave, the rule on substantial defects in instructions applied, rather than the rule of waiver. *Pegram*, 124 Ill. 2d at 172.

■ This case is clearly distinguishable. Here, trial counsel tendered and the court accepted precisely the instructions for first degree murder and involuntary manslaughter that had been promulgated and approved at the time by the Illinois Supreme Court Committee on Jury Instructions. In order for this case to parallel *Pegram*, trial counsel would have had to fail to tender any instructions on the involuntary manslaughter offense. The instructions tendered were complete and were not erroneous. Consequently, counsel's tendering them and failing to tender some other instruction was not deficient in any way and does not amount to ineffective assistance of counsel.

For all of the reasons given above, we affirm the judgment of the circuit court.

Affirmed.

SCARIANO, J., concurs.

JUSTICE McCORMICK, dissenting:

The prosecutor made improper argument and the trial court gave erroneous instructions, both of which could have confused the jury about the mental state required to support a conviction of defendant for first degree murder. I would reverse the conviction and remand for retrial by a properly instructed jury which is not subjected to misleading argument.

The majority acknowledges that the trial court here erroneously instructed the jurors that if they found defendant guilty of both murder and involuntary manslaughter they should sign only the murder verdict. The instruction improperly implies that a defendant who meets the mental state requirement for involuntary manslaughter could also be guilty of murder. (*Summers*, 202 Ill. App. 3d at 12; *Tucker*, 245 Ill. App. 3d at 728-29.) In both *Summers* and *Tucker* the appellate court found the erroneous instruction harmless because other instructions and closing argument clarified the mental state requirement. In this case the prosecutor further misled the jurors with a closing argument that gave the jurors the impression that defendant could be found guilty of murder based on the mental state of other participants in the killing. If this were true, then defendant could be guilty of both involuntary manslaughter, based on his own mental state, and murder, based on the mental state of an accomplice. The trial court's erroneous instruction confirmed this possibility, and other instructions did nothing to rectify the error.

The jury tried only the cases against defendant and Shawn Downey, so the prosecutor's argument to the jury should have pertained only to the guilt of those two defendants. The prosecutor had a separate opportunity to argue to the court without jury the evidence of the Georges' guilt. To the jury the prosecutor argued that both defendant and Downey were guilty because "the two defendants were participants in that particular plan" to shoot into or over the alley, or to beat up some members of the 2-6. The prosecutor later argued that defendant's statement was evidence of his intent, and with no indication of a change of subject, started discussing the criminal liability of the defendants generally under the accountability doctrine. The majority asserts that the prosecutor "went on to discuss the guilt of Downey." (264 Ill. App. 3d at 546.) The prosecutor did not in any way indicate to the jury that the argument did not pertain to defendant. The prosecutor could have clarified the separation of the arguments by informing the jury that the accountability argument pertained solely to Downey and not to defendant, or by reminding the jury that the person whose acts actually caused the death could not be guilty under an accountability theory. The prosecutor chose instead to merge the argument concerning accountability into the argument concerning defendant's mental state, saying:

"So it doesn't matter if it was in Shawn Downey's mind, Michael George's, or Robert George's, or whatever. They go out there to roll on some two-six boys. They are guilty of murder. If one of them goes afield of that, that's they way the law is. It's uniquely ta[i]lored for this type of gang-related act."

The court clarified before the jury its understanding that the argument pertained to defendant by overruling objections from both Downey and defendant on the basis of closing argument by defendant's attorney, and not Downey's attorney, which, in the court's view, invited this response.

The jurors had no need to consider the intent of the Georges, since they were not to decide their guilt. The mental state of the Georges had no bearing on the guilt of either defendant or Downey. The reference to the Georges "or whatever" could only serve to mislead the jurors to give them the impression that for defendant, too, it did not matter what was in his mind, he was guilty of murder as long as he participated in the plan to roll on some 2-6 boys, which is the sort of "gang-related act" the statute is "uniquely ta[i]lored" to address. The argument implicitly invited the jurors to apply the law of accountability when deciding defendant's guilt or innocence, particularly for deciding whether defendant met the mental state requirement for murder.

The majority does not suggest why the prosecutor needed to argue the guilt of the Georges to the jury. The effect of the irrelevant argument was to confuse the jury about the mental state required to show defendant and Downey guilty of murder. Defense counsel had no opportunity to offset the misleading argument because the prosecutor made this argument in rebuttal, after the defendant's closing argument, and the court overruled defense objections to the argument.

The majority asserts that the court clarified the mental state requirement by instructing the jury that "in order to sustain the charge of first degree murder, it must find that the defendant performed the act which caused Madrigal's death, and that defendant intended to kill or do great bodily harm to Madrigal or another, or that he knew his acts would cause death to Madrigal or another, or that he knew his acts created a strong probability of death or great bodily harm to Madrigal or another." (264 Ill. App. 3d at 541.) This assertion would be true if the court did not give the acountability instruction or if the court instructed the jury that the accountability instruction did not apply to the State's case against the person whose acts directly caused death. Instead, the court instructed the jurors that they could find both defendant and Downey guilty of first

degree murder if either defendant or Downey or some person for whom they were accountable met the elements necessary for proof of murder. Contrary to the majority's assertion, the accountability instruction does not plainly apply only to those vicariously liable for a crime, and a defendant may be found guilty under an accountability theory even when his own acts constituted the principal offense. (See *People v. Lesley* (1986), 144 Ill. App. 3d 22, 494 N.E.2d 270.) No instruction here clarified that all of the elements of first-degree murder had to be met by one person, and no instruction implied that the jury had to find that defendant both caused the death and had one of the mental states listed in the instruction. The jurors were left with the impression from the prosecutor's misleading argument that it did not matter which of the persons involved in the killing met the mental state requirement, as long as one of them met the mental state requirement.

Instead of clarifying the mental state requirement for defendant, the court instead gave the erroneous instruction informing the jurors that they could find defendant guilty of both murder and involuntary manslaughter, and if they did so they should sign only the verdict form for murder. To find defendant guilty of involuntary manslaughter, the jurors would need to find that when he performed the acts which caused death, he "consciously disregarded a substantial and unjustifiable risk" that his acts would cause death. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—3, 4—4.) Our supreme court has clarified that it is not possible for a defendant to have both this mental state and the mental state required for murder. (*Hoffer*, 106 Ill. 2d at 194-95.) However, in this case, especially in light of the prosecutor's argument, the jurors could have understood the instructions to mean that if defendant himself had the mental state necessary for finding him guilty of involuntary manslaughter, while one who participated with him had the mental state required for murder, defendant would be guilty of involuntary manslaughter, based on his mental state, and under the doctrine of accountability, he would be guilty of murder based on the mental states of the Georges or Downey.

Thus, the prosecutor's argument could have given the jury the impression that defendant could be guilty of murder based on the mental state of one of the other participants in the killing, and neither the instructions nor further argument offset this erroneous impression. Instead, the instructions exacerbated the error by implying that defendant could meet the mental state requirements for both murder and involuntary manslaughter. This could be true only if defendant, the person whose acts actually caused death, could also be accountable for the mental state of another. Because I cannot

say that the jury was not so misled by argument and instruction, I would reverse and remand for retrial.