THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE TRIPP, Defendant-Appellant.

First District (5th Division)    No. 1—93—1581

Opinion filed March 10, 1995.—Rehearing denied April 6, 1995.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Defendant Bruce Tripp was convicted in a jury trial of first degree murder in the beating death of two-year-old Deandre Boyce. On appeal, defendant contends that three errors necessitate that he be granted a new trial: (1) the trial court erred in failing to order a mistrial or other relief when the State violated discovery rules by failing to disclose before trial the substance of defendant's arguments with the victim's mother, Cheryl Boyce; (2) the trial court erred in allowing Andre McKennie's testimony as to defendant's statements when the State had failed to previously disclose the substance of those statements; and (3) defendant was denied a fair trial by the chief medical examiner's testimony "the child was beaten to death, period."

We reverse and remand.

On Monday, February 8, 1983, as both sides were presenting their pretrial motions, the following colloquy ensued:

"MS. LUBELFELD (Defense counsel): Judge, the next motion would be—we have a motion titled, motion for supplemental discovery. It's a brief motion that we're asking—we are telling the Court that Mr. Tripp relies on all of the discovery that has been tendered by the prosecution. And before the trial begins, he needs to know if there's any mistakes or any material omissions in any discovery that has been tendered to us before trial.

MS. MEBANE (the State): Your Honor, that to me presumes something.

THE COURT: It's just basically based upon the continuing obligations of discovery set forth in the rules. Any continuing discovery obligation that has just recently come to your attention?

MS. MEBANE: Your Honor, nothing recently."

The trial began the next day, Tuesday February 9, 1993. In opening statements, the State argued:

"MS. MEBANE: All of the acts that Bruce Tripp performed when he beat this child he did intentionally. You will see evidence of that. You will hear evidence of that. This child was severely beaten because Bruce didn't like his father; because Bruce wanted his father out of the picture."

The State called Cheryl Boyce as its first witness. Ms. Boyce testified that on September 27 (although apparently September 28), 1989, the defendant came in his car to her home and picked up her and their infant son, Xavier. They went to his house at 4 a.m., at 4323 W. Madison in Chicago, where the defendant wanted to have sex, but Ms. Boyce refused. They also talked for an hour about Ms. Boyce's former boyfriend, Andre McKennie, and the defendant told Ms. Boyce that he was tired of Mr. McKennie going to her house. The defense objected to these statements on the basis of hearsay but was overruled.

That evening, Ms. Boyce's sisters brought over to the house Ms. Boyce's other son, Deandre, whose father was Andre McKennie. At 11 p.m., Ms. Boyce left the house to visit a friend and get a change of clothes at her mother's house. She returned to the defendant's house at about 1:45 a.m. and stayed in his front room listening to the radio until around 3 a.m. When she went to the bedroom, she heard some vomiting and looked to see that Deandre had just vomited while tucked under a cover. As she went to pick Deandre up, the defendant grabbed him and took him to the washroom, telling Ms. Boyce to change the sheets. A short time later, the defendant came back and told her that Deandre was not breathing. Ms. Boyce asked the defendant what happened, and the defendant replied, "I threw him up and he fell." Ms. Boyce and the defendant's cousin took Deandre to the hospital, while the defendant stated he would meet them at the hospital after taking Xavier from the house to his sister's house. Deandre died at the hospital, and Ms. Boyce never met the defendant there.

Ms. Boyce then testified as to several previous conversations with the defendant. In these disputes, the defendant indicated he was very jealous of Ms. Boyce ever being with Mr. McKennie, once to the point of beating Ms. Boyce. These disputes included a more detailed version of the McKennie conversation of September 27 (28), 1989. The defense objected that it had not been tendered any of the defendant's

statements in discovery, and the defense twice requested a sidebar. The trial court overruled the objections. The State's questioning included the following colloquy about a conversation alleged to have occurred in August of 1989 when the defendant saw Mr. McKennie with Ms. Boyce in front of her home:

> "MS. MEBANE: What if anything did Bruce say to you when he caught you with Andre?
>
> MS. BOYCE: He say he don't want to catch me with that punk motherfucker no more.
>
> MS. MEBANE: Then what happened? What did you say?
>
> MS. BOYCE: I told him he could come over and see his son.
>
> MS. MEBANE: What did he say to you?
>
> MS. BOYCE: He was like, he ain't have to come over anymore. I buy his stuff.
>
> MS. MEBANE: What did you say to him?
>
> MS. BOYCE: I told him it was Andre baby. He buy it."

The State completed its direct examination of Ms. Boyce, and the trial court recessed for lunch. After the jury exited the room, the following colloquy ensued:

> "MR. O'HARA (Defense counsel): Judge, we would make a continuing objection to the testimony of this witness, specifically to her testimony regarding statements allegedly given by Bruce Tripp over a period of time. ***
>
> This is the first time we have ever heard of any of these statements regarding Bruce's alleged complaints about Andre, about threats, about any beating or fighting with her. Her whole testimony basically regarding the relationship with Bruce Tripp was not contained in any discovery ever tendered to us, and I believe as a statement of the defendant, it should have been tendered to us. It's clearly prejudicial, and we'd make a motion for a mistrial based upon that.
>
> THE COURT: Well, denied. *** [T]hese are statements made prior to the event in question, not memorialized, not reduced to writing. And I don't think they are of such magnitude, such significance, that it would violate the defendant's due process rights by, as you say, hearing them for the first time here.
>
> MR. O'HARA: I just, just beg to differ about the magnitude of them. It clearly gives motive to this defendant.
>
> THE COURT: You are right there. It goes to the defendant's state of mind whether he, as the defense said in opening statements, loved Andre's child, or was, did not love Andre's child and was frustrated and angered by the whole situation. I agree that it does show relevance, and it has some degree of magnitude. ***

As a general statement, the State does not have to reduce every statement made by the defendant to writing, or otherwise notify defense counsel. And I believe that the non-notification of the things pointed out by the defense *** does not violate the discovery rules."

The State called Andre McKennie as its next witness. As Mr. McKennie began to recount confrontations with the defendant, the defense objected and asked to be heard in sidebar. The defense indicated that the State had told them that McKennie was to be merely a life-and-death witness. The following colloquy ensued:

"THE COURT: I'd ask the State, did you ever tell the defense counsel that this witness was going to only be called for life-and-death?

MS. MEBANE: *** We indicated he was a life-and-death witness. We asked this witness this morning—we received information this weekend as to the nature of the relationship between Mr. Tripp and this witness. We were able to hunt him down, have an investigator find him, because we weren't able to get him. We talked to him prior to lunch. We were unaware of this particular situation until just recently your honor. This was new information to us.

* * *

THE COURT: Then here's what I think should be done at this point, unless the defense counsel doesn't care to have it done. Let him be withdrawn as a witness, subject to the defense interviewing him, because I can see where they didn't interview him before, figuring him only to be a life-and-death witness.

* * *

MR. O'HARA: This is surely a matter the State had knowledge of in talking with Cheryl. It's not something they found out this morning. They knew this guy was involved in these matters, too.

THE COURT: Well, I'm going to say, if you want him withdrawn as a witness now, I will allow you and order him to subject himself to an interview by you before he continues his testimony, if that's what you would want. Otherwise I'm going to accept the State's word that, in good faith, they didn't realize he was going to be able to testify to this, and didn't even talk to him for the first time until this morning."

The defense then interviewed Mr. McKennie in the judge's chambers. After completing the interview, this colloquy ensued:

"MR. O'HARA: Judge, I would once again renew my objection to Mr. McKennie testifying. At this point we cannot

be prepared to conduct a meaningful cross-examination of this witness with the short period we had to examine him. Plus, what he is testifying to, once again, are materials not tendered to us. It clearly goes to motive. *** And to allow him to testify at this point would be a violation of the discovery rules. ***

THE COURT: *** [A]ll things considered, particularly the fact that the State was not aware, as you were not aware and therefore, did nothing intentional with respect to take you by surprise, I'm going to allow him to testify over the defense objection."

Mr. McKennie testified that while driving with Ms. Boyce and Xavier in July of 1989, he was confronted by the defendant, who was a passenger in a car driven by his cousin. The defendant told him to pull over or he would start shooting. A car chase ensued in which the defendant's car hit McKennie's car once, and then McKennie's car pulled away.

Following Mr. McKennie's testimony, Officer David Cartalano testified that about 6 a.m. on September 29, 1989, he went to 4323 W. Madison in Chicago to look for the defendant and a baby. When he arrived he heard a baby cry, and he forced the door to the home open. The baby was left alone on a bed, while a window was left open to the back porch.

Dr. Robert Stein performed the autopsy on Deandre Boyce. He testified that the victim had blood on his lips and in both nostrils. The victim's scalp had linear abrasions which were consistent with the dragging of the victim. Underneath the scalp a hemorrhage was present which measured 1.5 inches. The victim's testes were swollen to twice their normal size, due to trauma. The doctor counted 100 bruises on the victim on all areas of his body above the legs, consistent with being caused by knuckles. The membranes holding the intestines were torn, causing internal hemorrhaging. The victim had a red area on his anus, consistent with a nonphallic foreign object being placed there, but also consistent with an acid loose stool or a hard stool from constipation. Below the victim's right ear were punctate marks consistent with injuries made by a needle. The doctor stated that the victim died from multiple external and internal injuries. On cross-examination, Dr. Stein stated that the facial injuries could be consistent with some types of falls, and that children and some individuals bruise more easily. The victim had no fractures, nor internal injuries to any other organs.

Following the close of re-cross-examination, the trial court began the following colloquy:

"THE COURT: Doctor, what again was the cause of death in the case in your opinion?

DR. STEIN: In my opinion, multiple external and internal injuries. The child was beaten to death, period.

MR. O'HARA: Objection, Judge.

THE COURT: Well, 'the child was beaten to death' will be stricken. The first portion will stand."

Dr. John Kenney testified as a dental expert, examining three bite marks on the left arm of Deandre. Dr. Kenney stated that he believed to a reasonable certainty that one bite mark matched the lower dentition of the defendant's teeth, and another mark probably matched the lower dentition of the defendant's teeth. Dr. Kenney testified that the third bite was a suck mark or "hickie" that was inflicted at approximately the same time as the other two bites. No skin was broken on any of the bites.

The State then called Detective James Capesius. Detective Capesius testified that he spoke to the defendant when he came to the police station voluntarily on the afternoon of September 30, 1989. Following the *Miranda* warnings, the defendant told Detective Capesius that he had been "thumping" Deandre by putting his thumb on two or three fingers and thrusting the fingers out. The defendant was doing this because he did not want Deandre to grow up to be a sissy. The defendant told Detective Capesius that he was tossing Deandre in the air but failed to catch him one time, and he came down wrong and landed on the carpeting. The defendant denied using any hard drugs that night, stating that he had smoked marijuana around noon that day. After Deandre was taken to the hospital, the defendant stated that he stayed with his own infant for a few minutes but then grabbed his gun and stayed in a local hotel until he came to turn himself in.

The State next called Patricia Wolfe, a former assistant State's Attorney. She was present for the same interview with the defendant as Detective Capesius, and she reiterated almost exactly his testimony regarding the defendant's description of the incident with Deandre. However, she did not testify as to the latter stages of the interview, which included the defendant's drug usage that day and what the defendant had stated he did following the victim's being taken to the hospital.

The defense presented Carolyn Tripp, the defendant's sister, and Felisa Hyde, the defendant's cousin. Both testified that the defendant loved and cared for Deandre, taking care of him more often than Ms. Boyce. Neither had ever seen the defendant mistreat Deandre.

Felisa Hyde also testified that the defendant had a very serious drug problem and that on September 27, 1989, she had seen the defendant snort white powder up his nose five times. She testified that

after the defendant inhaled the powder he looked high, in that his eyes were red and slow and his voice had changed. She next saw the defendant at 6 a.m., September 29, 1989. Ms. Hyde testified that the defendant looked high when he came over, in that he was behaving the same as he had after he had inhaled powder on September 27, 1989, and on other occasions after Ms. Hyde had seen the defendant inhale powder.

At 6 a.m. on September 29, 1989, Ms. Hyde was staying at her cousin Joyce's house, and the defendant came over to Joyce's house and telephoned his sister Carolyn to go to his house and get his baby. Ms. Hyde, Joyce, and the defendant then went to the hospital, driven there by a friend. Ms. Hyde and Joyce then entered the hospital and found out that the victim was dead. As they left the hospital, they met the defendant, who was walking in. Ms. Hyde told the defendant to get back in the car because the victim was dead and the police were looking for him. Ms. Hyde, Joyce, and the defendant then went back to Joyce's house.

Following Ms. Hyde, the defense called Ms. Mieszala, who was certified by the court as an expert in the field of clinical social work. Ms. Mieszala testified that she conducted a clinical interview with the defendant on April 8, 1992. She spoke with the defendant and gave him six psychological tests. She scored the tests and then gave them to Dr. Vincent Pisani for evaluation. The defendant had told her that he was using heroin, cocaine, marijuana, and alcohol on September 29, 1989. She also discussed her conversations with the defendant to Dr. Pisani.

The defense next called Dr. Vincent Pisani. He testified as an expert in the fields of clinical psychology and addictive behavior. Dr. Pisani interpreted the results from the tests and the clinical interview given by Ms. Mieszala, and he testified it was not necessary for him to have actually seen the defendant for his results to be valid. Dr. Pisani concluded that the defendant was very likely a polydrug-dependant individual. Dr. Pisani testified that, assuming the defendant had snorted a large amount of heroin on September 27, 1989, he probably could not form the intent to kill. The following colloquy ensued:

"MS. LUBELFELD: How did you arrive at that opinion?

DR. PISANI: Because his judgment would have been impaired and his judgment and thinking would have been slowed down. He also at the same time, if he in fact has an alcohol-drug problem or a polydrug problem, would be in a state where he would be somewhat impulse ridden, that is to say he wouldn't have too much control over certain impulses. So I would say it would be unlikely he would be able to formulate or form an intent to kill."

In its closing argument, the State reiterated several times the defendant's statements about McKennie and his jealousy motive, concluding:

"MS. MEBANE: And when he realized that Cheryl's attention would have to be divided between him and Andre McKennie because of Deandre, that was it. There was only one way to solve his problem. There was only one way to make sure that Andre McKennie *didn't come around any more.* And that was to dispose of his son, to get rid of his son."

The jury retired and was given verdict forms for first degree murder, involuntary manslaughter, and not guilty. The jury found the defendant guilty of first degree murder, and the trial court sentenced him to 66 years of incarceration.

OPINION

■ At oral argument, the State admitted that it had violated discovery procedures under Supreme Court Rule 412(a)(ii). (134 Ill. 2d R. 412(a).) Rule 412(a)(ii) states:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material or information within its possession or control:
\*\*\*
(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledging of such statements." (134 Ill. 2d R. 412(a)(ii).)

Pursuant to this rule, the defense had made a written motion before trial for any witnesses presenting statements of the accused and had requested the substance of those statements. Although the State has a continuing duty to disclose additional discovery under Rule 415 (134 Ill. 2d R. 415), the defense made an additional oral request the day before trial for any recent discovery the State was required to present.

■ The State violated Rule 412(a)(ii) by not tendering the substance of defendant's statements which the State learned from Ms. Boyce. The State apparently learned of defendant's statements the weekend before the trial. The State has the duty to disclose to the defense, upon request, the substance of all oral and written statements made by the defendant and known by the State. (*People v. R.D.* (1993), 155 Ill. 2d 122, 140, 613 N.E.2d 706.) The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation. (*People v. Robinson*

(1993), 157 Ill. 2d 68, 79, 623 N.E.2d 352.) This rule is not limited to formal statements made to the authorities, but encompasses any statements made to anyone that might have a bearing on the defendant's guilt or innocence. (*R.D.*, 155 Ill. 2d at 140.) The nondisclosure was a violation whether or not the State's conduct was inadvertent or purposeful. *People v. Weaver* (1983), 92 Ill. 2d 545, 558, 442 N.E.2d 255.

However, the failure to comply with discovery requirements does not always necessitate a new trial. While compliance with the discovery rules is mandatory, the failure to comply with these requirements does not require a reversal absent a showing of surprise or undue prejudice. (*Robinson*, 157 Ill. 2d at 68.) A new trial should only be granted if the defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. (*People v. Pasch* (1992), 152 Ill. 2d 133, 193, 604 N.E.2d 294.) As to the latter test, the trial court overruled all defense objections and thus clearly failed to eliminate any prejudice in this matter.

In looking at the test of prejudice, the State first contends that the defendant has waived all claims of prejudice by his failing to request a continuance after Boyce had presented her testimony. We disagree, because the defense was unable to request a continuance before the damage had already been accomplished by Boyce's testimony. In *Weaver*, even though the defendant refused to accept a continuance following damaging testimony, the Illinois Supreme Court remanded for a new trial because the testimony had occurred before it was possible for the defendant to request a continuance. (*Weaver*, 92 Ill. 2d at 559-61.) Because the damaging testimony was already in evidence, a continuance may not have been an appropriate remedy in the middle of the trial. (*People v. Agyei* (1992), 232 Ill. App. 3d 546, 554-55, 597 N.E.2d 696.) After a trial court overrules the defense objections, the failure to request a continuance should not preclude review. *People v. McFee* (1992), 230 Ill. App. 3d 356, 362, 595 N.E.2d 64.

Consequently, we must determine if this violation was unduly prejudicial to the defendant or, as the State maintains, merely harmless error. Among the factors in determining whether a defendant is entitled to a new trial from a discovery violation of the State are the willfulness of the State in failing to disclose the new evidence, the closeness of the evidence, and the likelihood that prior notice could have helped the defense discredit the evidence. *Robinson*, 157 Ill. 2d at 81.

Assessing the first factor, we conclude that the State acted willfully in this discovery violation. The defense made a request for ad-

ditional discovery immediately following the weekend during which the State learned of the defendant's statements from Ms. Boyce. The State has provided no explanation for its failure to tender any information to the defense. In similar circumstances, we have found the actions of the State "apparently willful." (*Agyei*, 232 Ill. App. 3d at 555.) Moreover, this was not an isolated statement or piece of evidence, but an entire area of the State's case against the defendant. The State surprised the defense with its motive testimony, and there is nothing to indicate that the State did not specifically intend to ambush the defense at trial with these statements.

In examining the evidence against the defendant, the State argues that its case was overwhelming even without testimony of the defendant's statements. Indeed, the physical injuries of the victim were quite extensive. However, the State's argument is undercut by the tremendous importance it placed on the defendant's statements in its opening and closing arguments. The State repeatedly argued that the defendant's jealousy to keep McKennie away from Ms. Boyce drove the defendant to kill their child. We do not believe the victim's injuries, in isolation, were overwhelming evidence of the defendant's intent in inflicting them.

The final factor is the likelihood that prior notice could have helped the defense discredit the evidence. The burden of showing surprise or prejudice is upon the defendant (*Robinson*, 157 Ill. 2d at 78), and we believe the defendant has made a sufficient showing. Intent was the crucial issue in this matter. In multiple interviews of Ms. Boyce, by the State's Attorney's office, police officers and detectives, and Aid to Families with Dependent Children, Ms. Boyce had never mentioned any arguments with the defendant over McKennie. She had called the defendant her boyfriend, and she had no idea of any motive for the incident. The defense was surprised at trial by her new recounting of incidents which may have given the defendant a jealousy motive, evidence which the trial court found "does show relevance, and it has some degree of magnitude."

The prejudice resulting from surprise, unfairness, and inadequate preparation, as well as from the lack of opportunity to investigate the circumstances surrounding undisclosed alleged statements, is so incalculable that it cannot be conjectured by the court. (*People v. Ramey* (1992), 237 Ill. App. 3d 1001, 1010, 606 N.E.2d 39.) It would be unsubstantiated speculation to say that prior notice could not have helped the defense. (See *Agyei*, 232 Ill. App. 3d at 555.) Motive evidence was an important ingredient in establishing guilt beyond a reasonable doubt, and we cannot say that the defendant could not accomplish a better defense given adequate time to prepare for this aspect of the State's case. See *Weaver*, 92 Ill. 2d at 560.

■ In addition to the testimony by Ms. Boyce, the State also admits error in not tendering the defendant's statements it planned to elicit from Mr. McKennie, in violation of Rule 412. Even if the State learned of McKennie's testimony immediately prior to calling him to testify, the State had the duty to first inform the defense. (*People v. Valdez* (1992), 230 Ill. App. 3d 975, 984, 595 N.E.2d 1245 ("Even if the State only learned of the officers' statements the morning of trial, this does not excuse its failure to disclose this information").) However, because the defendant learned of the State's evidence almost immediately after the State did, before any significant testimony by the witness, the prejudice to the defendant was minimized. Until the State interviews a witness and knows of the particular statements allegedly given by the defendant, the information is not within the State's "possession or control" under the provisions of Rule 412(a). (See *People v. Hemphill* (1992), 230 Ill. App. 3d 453, 470, 594 N.E.2d 1279; *People v. Young* (1981), 97 Ill. App. 3d 187, 191, 423 N.E.2d 221 (State did not have "definitive knowledge" of evidence).) Moreover, defense counsel was given and took advantage of the opportunity to interview the witness before he testified, substantially curing any prejudice involved. See *People v. Weber* (1994), 264 Ill. App. 3d 310, 316, 636 N.E.2d 902; *Hemphill*, 230 Ill. App. 3d at 464.

Although the defendant suffered no substantial additional prejudice from the introduction of Mr. McKennie's testimony, the State's nondisclosure reemphasizes its callous attitude toward the discovery provisions. This is especially true considering that the State did not inform the defense even after the extended discussion pertaining to the testimony of Ms. Boyce. Lastly, we believe that the State should have informed the defense before trial of its intention to use Mr. McKennie as more than a life-and-death witness, contrary to its earlier communication. Although the State has no obligation to classify witnesses (*People v. Jones* (1992), 153 Ill. 2d 155, 163, 606 N.E.2d 1145), the State does have a duty to correct any misleading characterizations it has made.

■ We believe an analysis of relevant factors shows that the defendant suffered prejudice in this matter that was not cured by the trial court. We cannot say the prejudice from the errors was harmless beyond a reasonable doubt, and thus reversal is required. (*People v. Cruz* (1994), 162 Ill. 2d 314, 374, 643 N.E.2d 636.) Because the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, defendant faces no risk of double jeopardy and may be retried. (*Cruz*, 162 Ill. 2d at 375.) Since we must reverse the defendant's conviction in this matter, we need not address his contentions as to the opinion testimony of Dr. Stein.

For the foregoing reasons, the judgment of the trial court is reversed and set aside, and the cause is remanded for further proceedings in accordance herewith.

Reversed and remanded.

McNULTY and T. O'BRIEN, JJ., concur.