THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD POGUE, Defendant-Appellant.

First District (5th Division)   No. 1—97—0504

Opinion filed July 9, 1999.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HOURIHANE delivered the opinion of the court:

Following a jury trial, defendant Richard Pogue was convicted of first degree murder and attempted murder and sentenced to concurrent terms of 33 years and 30 years, respectively. Defendant raises several issues on appeal. We deem dispositive his contention that he was denied his right to a fair and impartial jury. Accordingly, we reverse and remand for a new trial.

## BACKGROUND

The charges arose from the January 9, 1995, fatal shooting of Maurice Wellborn and the attempted murder of Jevon Bryant.

Prior to trial, defendant moved to suppress his statements to police. At the hearing thereon, Chicago police officer Edgar Neal testified that at 4 p.m. on March 27, 1995, he arrested defendant, then age 16, on an unrelated gun charge. The officer stopped at defendant's home and spoke with his mother, Phyllis Pogue, who accompanied them to the station. Neal became aware of a murder warrant for defendant and advised the violent crimes detective unit. After processing on the gun charge, defendant was taken to an unidentified youth officer. His mother remained in another area of the station.

Detective Michael Baker testified that at 7 p.m. he took defendant into custody. A half-hour later, he placed defendant in an interview room and advised him of his *Miranda* rights. Baker's partners, Detec-

tives Solecki and Siwek, were present. Defendant did not appear to be learning disabled and said that he understood each right. Baker also advised defendant of the allegations against him and that he had been arrested on a murder warrant. Defendant made an initial statement.

A short time later, defendant said he wished to tell the truth. Baker again advised defendant of his *Miranda* rights. Defendant then gave a statement, admitting his participation in the shooting. Baker did not tell defendant that his mother or a youth officer could be present, and at no time did defendant ask to speak to a lawyer or to his mother.

Baker further testified that defendant's mother arrived at the station sometime between 9 p.m. and 10:45 p.m. and that attempts to contact her earlier were made by a youth officer. As soon as Baker knew Ms. Pogue was at the station, she was allowed to see her son. Defendant, in the presence of his mother, gave a statement to an assistant State's Attorney (ASA).

Finally, Baker testified that defendant was not handcuffed and the door to the interview room was not locked. Defendant was offered the use of the bathroom and the water fountain.

Next, Detective Edward Siwek testified that he was in the interview room at 10:45 p.m., along with Ms. Pogue. The ASA advised defendant of his *Miranda* rights, which defendant said he understood. Defendant then relayed his account of the shooting. Defendant did not ask for an attorney or make any other request, and his mother did not interrupt his statement.

Siwek also testified that Ms. Pogue was brought to the interview room as soon as she arrived and that attempts had been made to contact her earlier. Siwek believed defendant was informed that he could be charged as an adult.

ASA Corey Pollack testified that he arrived at the station at 9 p.m. and met with detectives. He learned that defendant was 16½ years old and that neither a relative nor a youth officer was present. He did not recall whether he was told that defendant had made inculpatory statements. Pollack waited to see if a relative would arrive and then, at about 10:15 p.m., spoke to defendant.

Pollack found defendant sleeping on a bench in the interview room; he was not handcuffed. He woke up defendant and identified himself. Pollack advised defendant of his *Miranda* rights and told him he could be charged with murder as an adult. Defendant said he understood each right and agreed to talk to him. Pollack advised defendant that he could have his mother, a relative, or a youth officer present. Defendant said he did not want his mother present because the incident involved gangs and she did not want him "gangbanging." He further

said that he had been locked up before, knew the situation and did not want anyone present. Defendant's rap sheet indicated five prior police contacts, the most recent involving an aggravated battery about a year prior.

Pollack spoke to defendant for about 15 minutes and then left the interview room. Shortly before 10:30 p.m., after learning that defendant's mother had arrived, Pollack went to speak to her. He identified himself, told her that defendant was there on a murder warrant, and that defendant did not want her in the room. Ms. Pogue said she knew about the warrant and wanted to see her son. Pollack took her to the interview room and left, returning about 15 minutes later with Siwek. With Ms. Pogue present, Pollack advised defendant of his *Miranda* rights and that he could be tried as an adult. Defendant again indicated he understood. Defendant repeated his earlier statement. According to Pollack, either defendant or his mother declined to have the statement reduced to writing because they knew people " 'that have had things written down and had to sign things and they wound up going to jail.' "

Defendant's mother testified that between 4 and 5 p.m. on March 27, 1995, she went with her son to the station on a gun charge. After she sat with him for two hours, he was taken for handprinting. She waited for several hours and asked the desk officer about her son, who he said was being fingerprinted. At no time was she advised that he was being questioned about a murder. She finally saw her son at about midnight. He was sleepy and hungry. He told her the police had questioned him.

Just before 1 a.m., Ms. Pogue had a conversation with two ASAs, who told her they were charging her son with murder. She left the station at about 1 a.m. for 15 minutes to pick up some food, and then remained at the station until 2 a.m. Defendant was not given *Miranda* warnings in her presence.

At the time of his arrest, defendant was in the tenth grade and was in a specialized program to improve his reading. It was not, according to Ms. Pogue, a learning disability program.

Following argument, the court denied defendant's motion to suppress statements.

Because defendant does not challenge the sufficiency of the evidence to convict, we merely summarize the evidence at trial.

On January 9, 1995 at 9:30 p.m., Jevon Bryant (age 18), Kevin Freeman (13), DeAngelo Downs (13) and Maurice Wellborn (15) were joyriding in a borrowed car in the area of 119th and La Salle Streets in Chicago. All four youths were members of the Black Disciples street gang. In the front seat were Bryant, who was driving, and Freeman. Downs and Wellborn were in the backseat.

As they drove on 119th, they saw defendant, whom Freeman and Downs recognized and whom they knew to be a member of a rival gang. Defendant flashed a gang symbol. Purportedly, no one in the car responded. Defendant continued to walk on 119th toward La Salle.

The four youths drove through an alley and exited onto La Salle and there saw defendant again. He was to the right of the vehicle, toward the rear. Bryant attempted to make a right turn onto La Salle, but could not get traction in the snow. As Bryant accelerated, defendant, who was now behind the car, shot two or three times at the back of the vehicle. A second series of shots was heard, this time from the driver's side. The driver's window was shattered, and one of the bullets cut through the top of Bryant's coveralls, exiting his clothing without injuring him. When the car was able to pull away, Bryant drove to 119th and Lafayette, where he, Downs and Freeman exited the vehicle. They then realized that Wellborn had been shot. Bystanders called the police and paramedics.

The autopsy revealed that Wellborn died of a single gunshot wound to the rear of his head, the bullet coming from a 9 millimeter gun. Forensics recovered two spent nine millimeter shell casings from the alley where the second round of shots was fired and a 9 millimeter bullet that had entered the car through the trunk. No weapons were found in the vehicle, although a .45-caliber shell casing was recovered from the area where the car was parked.

According to defendant's March 27, 1995, oral statements to Siwek and Pollack, on the evening of January 9, 1995, defendant was walking to a liquor store and stopped at the house of a friend and fellow gang member to pick up a gun. As he walked back from the store, he saw a vehicle with several occupants who were members of a rival gang. Gang symbols were exchanged.

Defendant continued on 119th and then south on La Salle. The same car came through an alley, momentarily blocking his path. As the car moved up, defendant walked behind the vehicle. However, the car started to back up, and he fired a single shot into the rear of the car. As the vehicle drove away, defendant chased it a short distance, firing three or four more times into the car. Defendant fled the scene and disposed of the gun. When defendant learned that one of the occupants of the car had died, he told his mother what had happened. She told him the police were looking for him, but he refused to surrender.

A jury found defendant guilty of the first degree murder of Wellborn and the attempted murder of Bryant. Defendant was acquitted of the attempted murders of the other occupants of the vehicle. This appeal followed. 134 Ill. 2d R. 602.

## ANALYSIS

### I

Citing *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), defendant argues that the trial court committed reversible error by refusing to inquire into the bias of prospective jurors toward a defendant who declines to testify in his own behalf.

In *Zehr*, defendant requested that prospective jurors be asked whether they would have any hesitation in returning a not-guilty verdict if they believed the State had failed to sustain its burden of proof; whether, if the defendant decided not to testify, they would hold such decision against him; and whether they understood that the defendant is presumed innocent, does not have to offer any evidence, and must be proven guilty beyond a reasonable doubt.

Our supreme court held that the refusal to ask the questions was reversible error. "If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect." *Zehr*, 103 Ill. 2d at 477. Although the trial court need not have asked the questions in the form submitted, it should have covered the subject matter in the course of interrogation on *voir dire*. *Zehr*, 103 Ill. 2d at 477-78.

The record here reveals that prior to *voir dire*, the trial court advised the venire that defendant is presumed innocent, that such presumption remains with him throughout the trial, and that the presumption is not overcome unless the State proves defendant's guilt beyond a reasonable doubt. The court also admonished the venire that the State's burden of proof never shifts to defendant, that defendant is never required to prove his innocence, and that defendant may or may not present a case, as he chooses. The court also asked if any prospective juror believed he or she could not follow these principles. *Voir dire* then proceeded. After 19 individuals had been questioned by the court and 8 jurors had been selected and excused for the day, defendant raised the *Zehr* issue. The court refused to make any inquiry on this subject, believing it had adequately covered the matter when addressing the venire as a whole and that such inquiry was outside the scope of *Zehr*.

■ The State maintains that defendant has waived this issue by failing to submit a proposed *voir dire* question and by failing to object during the questioning of the first 19 prospective jurors. See *People v. Thomas*, 186 Ill. App. 3d 782, 799-800, 542 N.E.2d 881 (1989); *People v. Barnett*, 173 Ill. App. 3d 477, 485, 527 N.E.2d 1071 (1988). While the better practice would have been to submit a proposed question prior to the start of jury selection or to object after the first few jurors

were questioned, we do not believe defendant's failure to do so waived his right to have, at a minimum, the remaining jurors and alternates questioned about their ability to remain impartial should defendant not testify.

■ Citing *People v. Emerson*, 122 Ill. 2d 411, 522 N.E.2d 1109 (1987), and *People v. Leamons*, 127 Ill. App. 3d 1056, 469 N.E.2d 1137 (1984), the State contends that, even if no waiver occurred, the substance of the trial court's comments sufficiently comply with *Zehr*. We disagree.

At issue in *Emerson* was whether the trial court fulfilled the *Zehr* requirement as to the *presumption of innocence*. No argument was made, as here, that the court's questioning was deficient as to the *defendant's right not to testify*. These are separate and distinct inquiries, each going to a particular bias. See *Zehr*, 103 Ill. 2d at 477. Thus, *Emerson* is not on point.

In the *Leamons* case, the admonitions of the trial court are not entirely clear. However, at one point the decision states that the court "specifically told the jury that the defendant need not testify." *Leamons*, 127 Ill. App. 3d at 1066. Here, the venire was not so advised.

We are guided instead by our decisions in *People v. Wilson*, 139 Ill. App. 3d 726, 487 N.E.2d 1015 (1985), *rev'd on other grounds*, 112 Ill. 2d 567, 513 N.E.2d 844 (1986), and *People v. Boswell*, 132 Ill. App. 3d 52, 476 N.E.2d 1154 (1985), *rev'd on other grounds*, 111 Ill. 2d 571, 488 N.E.2d 273 (1986). In each case this court held that the trial judge's failure to question the venire as to defendant's right not to testify constituted reversible error. In neither case would we conclude that, because the jurors accepted the State's burden of proof and that defendant need not prove anything, the jurors also knew and accepted that the defendant need not testify in his own behalf. *Wilson*, 139 Ill. App. 3d at 736-37; *Boswell*, 132 Ill. App. 3d at 55-56. The same is true here. See *People v. Starks*, 169 Ill. App. 3d 588, 592-99, 523 N.E.2d 983 (1988).

■ The State further maintains that even if the court's admonitions to the jury were insufficient under *Zehr*, any error is harmless, given the overwhelming evidence of defendant's guilt. While the evidence was sufficient to convict, it is not so overwhelming that any *Zehr* violation is rendered harmless. Accordingly, we reverse and remand for a new trial.

In light of our decision, we address only those remaining issues likely to recur upon retrial.

## II

Defendant contends that, under *People v. Jimenez*, 284 Ill. App. 3d

908, 672 N.E.2d 914 (1996), the trial court erred by refusing to ask prospective jurors whether defendant's gang affiliation would affect their ability to be fair.

In *Jimenez*, this court held that the trial court committed reversible error when it refused to probe for juror bias against a defendant with a gang affiliation, where the State had sufficient evidence that gang affiliation provided the motive for the murder. Noting that gang membership is an area of potential bias, we found the complete lack of questioning on this issue allowed onto the jury persons predisposed to find defendant guilty solely because of his gang membership.

■ ■ *Jimenez* does not impose upon the trial court an affirmative duty to make inquiries *sua sponte* on gang bias. *People v. Williams*, 295 Ill. App. 3d 456, 466, 692 N.E.2d 723 (1998). However, where an appropriate question is tendered prior to *voir dire*, and the circumstances of the case are such that fundamental fairness requires that the venire be probed on this issue, the refusal to do so constitutes reversible error. See *People v. Terrell*, 185 Ill. 2d 467, 485, 708 N.E.2d 309 (1998). We believe the circumstances surrounding the January 9, 1995, shooting required the court, upon defendant's request, to interrogate potential jurors as to prejudice against a defendant who has a gang affiliation. The court's refusal to do so is reversible error.

### III

We next consider whether defendant's inculpatory statements to the police were voluntary.

■ Where a challenge to the voluntariness of a defendant's confession is made, the State bears the burden of proving, by a preponderance of the evidence, that the confession was voluntary. *People v. Gilliam*, 172 Ill. 2d 484, 501, 670 N.E.2d 606 (1996). To determine the voluntariness of a confession, including one from a juvenile, the court looks to the totality of the circumstances. *Gilliam*, 172 Ill. 2d at 500; *People v. Prude*, 66 Ill. 2d 470, 475, 363 N.E.2d 371 (1977). The test is whether the confession was " 'made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed.' " *Prude*, 66 Ill. 2d at 475, quoting *People v. Prim*, 53 Ill. 2d 62, 70, 289 N.E.2d 601 (1972). Factors to consider include individual aspects of the accused (age, intelligence, background, experience, mental capacity, education, physical condition, and experience with the criminal justice system), and the nature of the interrogation (the legality and duration of the detention, the duration of the questioning, and any physical and mental abuse by police). *Gilliam*, 172 Ill. 2d at 500-01; *People v. R.B.*, 232 Ill. App. 3d 583, 592-93, 597 N.E.2d 879 (1992). No one factor is dispositive. *Gilliam*, 172 Ill. 2d at 500.

When determining whether a juvenile confession is voluntary, additional factors come into play, such as the time of day and the presence of a parent or other interested adult. *In re Lashun H.*, 284 Ill. App. 3d 545, 551, 672 N.E.2d 331 (1996). However, a juvenile has no *per se* right to have a parent present during questioning or to consult with one prior to questioning. *Lashun H.*, 284 Ill. App. 3d at 552; *In re D.C.*, 244 Ill. App. 3d 55, 61, 613 N.E.2d 1139 (1992). Thus, the absence of a parent is one factor to consider but is not, itself, determinative of whether the juvenile's confession should be suppressed. *D.C.*, 244 Ill. App. 3d at 61; *R.B.*, 232 Ill. App. 3d at 593. Similarly, the absence or presence of a youth officer is not alone determinative of voluntariness but is a material factor to consider. *LaShun H.*, 284 Ill. App. 3d at 555. The key is whether the absence of an adult interested in defendant's welfare contributed to the coercive circumstances surrounding the interrogation. *D.C.*, 244 Ill. App. 3d at 61.

■ A finding of voluntariness by the trial court will not be reversed on review unless it is against the manifest weight of the evidence. *People v. Clark*, 114 Ill. 2d 450, 457, 501 N.E.2d 123 (1986). When considering a motion to suppress, it is for the trial court to determine the credibility of the witnesses and to resolve conflicts in the evidence. *People v. Melock*, 149 Ill. 2d 423, 432, 599 N.E.2d 941 (1992).

■ We find there is sufficient evidence in the record to support the trial court's determination that defendant's statements to police were voluntary. Considering first the characteristics of the defendant, at the time of questioning he was 16½ years old, a sophomore in high school. Although the suggestion has been made that defendant was learning disabled, Siwek testified to the contrary and defendant's mother testified only that her son was in a program to improve his reading. The record also indicates that defendant had five prior contacts with police. Further, based on the testimony of ASA Pollack, whom the trial court found credible, the defendant said he had been locked up before and understood the situation.

As to the circumstances of the interrogation, defendant was picked up at 4 p.m., not an unreasonable hour. The first three hours at the station were spent in part with his mother and in part being processed on an unrelated charge. Questioning on the murder charge began at 7:30 p.m. and concluded sometime after 11 p.m. There is no evidence of mistreatment by police.

Certainly, the detectives should have been advised earlier that defendant's mother was at the station. See *People v. Brown*, 182 Ill. App. 3d 1046, 1053-54, 538 N.E.2d 909 (1989). However, there is evidence that defendant was appropriately advised of his *Miranda* rights

and that he understood them. Also, Pollack testified that he advised defendant that, given his age, he could have a youth officer or a relative present and that he could be charged as an adult. Defendant, however, indicated he did not want anyone present, particularly his mother. Moreover, as soon as Pollack learned that Ms. Pogue was at the station, she was allowed to see her son privately. Upon subsequent questioning in her presence, defendant repeated the same statement he had given earlier.

Under the totality of the circumstances, and giving appropriate deference to the trial court's determination of credibility, its finding that the defendant's confession was voluntary is not against the manifest weight of the evidence. See *People v. Denton*, 256 Ill. App. 3d 403, 628 N.E.2d 900 (1993).

## IV

Defendant also contends that the trial court erred by barring evidence of prior violent acts of backseat passenger Downs. Defendant argues that such evidence was admissible under *People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984), to establish the violent propensity of the four youths in the car, whom he claims were acting in concert in a threatening manner, thus supporting his claim of self-defense.

■ As set forth in *Lynch*, a victim's violent and aggressive character may tend to support a theory of self-defense in two ways. First, knowledge of the victim's violent tendencies will affect a defendant's perceptions of and reactions to the victim's behavior. Second, where there are conflicting versions as to who was the aggressor, evidence of the victim's violent propensities tends to support the defendant's version.

■ Without regard to the merits of defendant's self-defense claim, we find that the evidence was properly excluded. There is nothing in the record indicating that defendant, at the time of the shooting, was aware of Downs' prior violent conduct. Thus, under *Lynch*, such evidence was inadmissible to show the reasonableness of defendant's reaction. *Lynch*, 104 Ill. 2d at 200. Rather, such evidence could only be used to support a defense theory as to who the aggressor was on the evening of January 9, 1995. However, the only conceivable aggressor (other than defendant) was Bryant, the driver of the vehicle, who allegedly backed up the car as defendant walked behind it. Where the evidence points to only one possible aggressor in a group, evidence of the violent propensities of other members of the group is irrelevant and inadmissible under *Lynch*. *People v. Ciavirelli*, 262 Ill. App. 3d 966, 972-73, 635 N.E.2d 610 (1994).

Defendant's reliance on *People v. Robinson*, 163 Ill. App. 3d 754,

516 N.E.2d 1292 (1987), is unavailing. In *Robinson*, a third party was killed while defendant allegedly committed an act of self-defense against his attacker. We held that the defendant should have been permitted to introduce evidence of prior threats and acts of violence by the third-party victim against the defendant to show defendant's state of mind at the time. That is not the case here, as the prior acts of violence did not involve defendant, nor did he have knowledge of the same.

## V

■ Finally, we comment briefly on two trial tactics of the prosecutor that defendant raises in issue. The first involves defendant's discovery request for an updated criminal history on Bryant. The update was obtained on the day of trial and was placed by an ASA on the prosecutor's courtroom table, which was next to defendant's table. While it would have required minimal effort for the prosecutor to hand the document to defense counsel, or at least place it in a conspicuous place on defendant's table, the prosecutor did neither. We find the State's method of tender suspect, at best, and contrary to the spirit of supreme court rules governing discovery in criminal cases.

We are also troubled by the prosecutor's conduct in eliciting testimony from ASA Pollack about an oral statement made by defendant, but not previously disclosed to defense counsel, in which defendant said he was not fearful of the car when it was backing up. Upon request, the State is *required* to disclose to defense counsel the substance of any oral statements made by defendant. 134 Ill. 2d R. 412(a)(ii); *People v. Allen*, 272 Ill. App. 3d 394, 398-99, 650 N.E.2d 250 (1995). The failure to disclose may result in substantial prejudice to defendant, requiring a new trial. *People v. Tripp*, 271 Ill. App. 3d 194, 202-04, 648 N.E.2d 241 (1995). Such a situation is more troubling when the witness testifying to the undisclosed oral statement is an ASA. It is difficult to understand how this nondisclosure could have occurred with a trained ASA.

For the reasons stated, we reverse defendant's convictions, vacate his sentences, and remand for a new trial.

Reversed and remanded.

HARTMAN and THEIS, JJ., concur.