THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES WILLIAMS, Defendant-Appellant.

First District (5th Division)    No. 1—98—2123

Opinion filed July 13, 2001.

---

420

REID, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Denise A. Avant, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Daniel W. Elbaum, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following simultaneous separate jury trials, Charles Williams and his codefendant, Dwight Peal, were found guilty of the first degree murder of Andrew Webb. Williams was 15 years old at the time of the offense but was tried and sentenced as an adult pursuant to section 5—4(6)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/5—4(6)(a) (West 1996)). Williams was initially sentenced to 30 years in the Illinois Department of Corrections, but after reconsideration, this sentence was reduced to 25 years. On appeal, defendant claims that: (1) the trial court should have suppressed his statements to the authorities; (2) the court erred in admitting prejudicial evidence regarding the structure of the Gangster Disciples street gang and defendant's gang membership; and (3) the evidence was insufficient to prove defendant's guilt on a theory of accountability where defendant asserts he was merely present at the time of the offense and did not participate in the shooting. For the reasons that follow, we affirm.

This case arose out of the facts concerning the shooting death of Andrew Webb in the early morning hours of July 13, 1996, in the lobby of the housing project building at 3542-44 South State Street, Chicago. The defendant was picked up by the police at 3:30 p.m. on July 16, 1996. Before trial, defendant filed a motion to suppress his statements obtained during his interrogation by police and prosecutors. Defendant argued that the police efforts to notify his mother of his whereabouts were insufficient, a youth officer was not present until eight hours after his arrest, and the youth officer expressed no interest in safeguarding his rights.

During the hearing on the motion to suppress, Detective Frank Valadez testified that defendant was picked up on July 16, 1996, at 3:30 p.m. by other police officers. Valadez testified that shortly after arrival at Area One police station, defendant told him he was 15 years old. Valadez asked defendant for his mother's home phone number and called it three or four times but no one answered. Valadez testified he then phoned defendant's mother's place of employment and left a message with a co-employee that it was important for the mother to call the police regarding her son. Valadez testified that at approximately 4 p.m. he checked on the availability of a youth officer to participate in the interview of defendant. He was told a youth officer would be sent to him as soon as one became available. Valadez interviewed other suspects and witnesses until youth officer Terrell saw him at 11:30 p.m. Shortly thereafter, Valadez gave defendant his *Miranda* rights and Terrell asked defendant "basic information." The interview took place in a large conference room and defendant was not handcuffed.

In his initial statement, at approximately midnight, defendant said he was with his girlfriend at the time of the shooting. Valadez testified that he spoke with the girlfriend, who did not corroborate defendant's story. Valadez talked to defendant again at 12:30 a.m. on July 17, 1996, and told him of the discrepancy. Defendant then admitted he was present at the shooting. At 3:30 a.m., an assistant State's Attorney interviewed defendant and defendant agreed to give a court reported statement. At 6 a.m., Assistant State's Attorney Michael Oppenheimer took a court-reported statement from defendant in the presence of Valadez and Terrell.

Defendant's mother also testified at the hearing on the motion to suppress. She testified that she is deaf but that she has a TTY phone in her home. A TTY telephone is designed to allow hearing-impaired persons to communicate over the telephone. When the phone rings, a light on the phone goes on. To communicate, the hearing-impaired person types in her message on the phone's keyboard. This message is then transmitted to another TTY phone, where it is printed out. Defendant's mother never saw the light on the phone go on, indicating an incoming call. On cross-examination she admitted that on the afternoon of July 16, 1996, a neighbor told her the police had picked up her son. The neighbor told her that she thought the police had taken her son to 51st and Wentworth. Defendant's mother testified that she did not go to Area One or call Area One. She also admitted that she would not have seen the light on the phone go on while she was sleeping.

Defendant testified that after being picked up by Valadez, he was

handcuffed and put in an interview room where he was handcuffed to a chair. Defendant testified that at one point Valadez told him that he had spoken to defendant's mother. Valadez said defendant's mother was not very happy with him and she told Valadez to "leave his black ass in here." Defendant testified that only the assistant State's Attorney read him his rights and when he made his court-reported statement at 6 a.m. he only repeated what the police told him about the case.

In rebuttal, Officer Thomas Richardson testified that he and his partner picked defendant up at 3:30, Valadez was not present, and defendant was not handcuffed. After arguments, the trial court denied the motion to suppress defendant's statements.

Fannie May Branch testified that about 5:30 p.m. on July 12, 1996, she was walking with her two cousins past the building located at 3542-44 South State Street in Chicago, which was "controlled" by the Gangster Disciples street gang. She saw a group of men she recognized as members of the Gangster Disciples standing outside the building. This group included defendant, James Freeman, Dwight Peal and Narvel Salter. Branch had lived in the area for a year and was familiar with all four and knew them to be members of the Gangster Disciples street gang. As she walked past the building, she saw Salter "writing some BD was going to die, something, GD, and then something." "BD" referred to the Black Disciples street gang, while "GD" referred to the Gangster Disciples street gang. Branch then went to her sister's home for the next several hours.

When Branch left her sister's house about 9:30 p.m., she saw the same group of men outside the side and back doors of the 3542 building, with other men she also recognized as members of the Gangster Disciples. Branch testified that the lights were on in the common areas. She went upstairs and played cards at her cousin's apartment until about 3 a.m. She then left her cousin's apartment and walked down the stairs.

At the bottom of the stairwell, Branch saw Peal, Salter, Mario Bailey and another person she only knew as "Mike" holding guns. She also saw that the lights in the hallway by the elevator were out and Peal was walking back and forth, looking out the front and back doors. When Branch asked why the lights were out, Salter stated that a peace treaty between the Gangster Disciples and the Black Disciples had been broken and that a "Black Disciple" was going to die. She heard Peal say, "Here come [sic] a Black Disciple," as the victim, Andrew Webb, walked through the front door. The victim said "What's up" but nobody replied. Salter then pushed Branch behind some bricks by the stairs, and he and Bailey each fired two shots at the victim.

Salter then told Branch to "get out." When she stood up, she saw the victim lying on the floor with blood around him. Peal then opened the door so she could leave. Branch testified that she did not see Peal or Mike fire any shots. Branch testified that she told a Chicago Housing Authority police officer what she had seen. She then talked to Detective John Bloore and later gave a written statement to an assistant State's Attorney and testified before a grand jury.

Cherlyn Wilson testified that she lived at 3542 South State Street, in July 1996 with her boyfriend, Andrew Webb. Before the shooting, there was a stick figure of a dead body with writing around it underneath her window. The building where she lived was controlled by Gangster Disciples. After hearing shots and getting phone calls from Webb's mother and some other people, Wilson went downstairs. Wilson saw Webb lying on the floor with one of his shoes off. There was a stick in the front door so the Gangster Disciples could prevent people from coming and going. She called the police, and when they arrived, she removed the stick from the door and let them in. Medical examiner Dr. Chira testified that Webb died as a result of gunshot wounds to his chest.

Over the objection of defendant, Detective John Bloore testified as a gang expert that the hierarchy of the Gangster Disciples consisted of the leader, Larry Hoover, then board members, governors, regions, coordinators, and soldiers. Coordinators make sure that the soldiers turn in their money and are paid. Soldiers are the lowest-ranking members in the gang, and if they do not do as they are told they are punished, or "violated," which may include being killed. Bloore testified that Narvel Salter was a coordinator for the Stateway Gardens housing project, which included the 3542-44 South State building. Bloore testified that defendant was a soldier and would not make any major decisions. Bloore testified that the Black Disciples had split from the Gangster Disciples. Webb was a "minister" in the Black Disciples, which is the equivalent of a governor in the Gangster Disciples. Webb was the leader of the building located at 3517 South Federal, another building in the Stateway Garden housing project, approximately one block from 3542 South State. Approximately a month before Webb was murdered, an administrator in the Black Disciples was killed. There was a dispute within the gang over whether the administrator had been shot by members of his own gang or the Gangster Disciples. This made things uneasy between the Gangster Disciples and the Black Disciples.

Officer Kyle Erbacker was at the scene of the shooting and saw a stick figure drawn in chalk just outside the rear door of 3542. Written next to the figure were the letters "GDN or die tonight bitch." On the

wall "NuNu" (Webb's nickname) and "G" were printed. He also saw a broken six-pointed star, which is a sign of disrespect for the Black Disciples. Some three hours later, he saw the letters "DOA" next to the figure.

Valadez testified before the jury in a manner consistent with his testimony at the hearing on the motion to suppress statements.

Assistant State's Attorney Oppenheimer testified before the jury in the same manner as at the suppression hearing. He additionally testified that he spoke to defendant alone and asked him how he had been treated by the police. Defendant said he had been treated well. While reading defendant his rights, during the court-reported statement, Oppenheimer told him that even though he was 15 years old, he would be tried and sentenced as an adult.

As defendant's conviction rests primarily on his statement, we will recite it in some detail. Defendant said that he had been a member of the Gangster Disciples for four or five months. He was a soldier—"I do what the people with rank tell me to do." He said there was a meeting of the Gangster Disciples board on July 12, 1996. "I was told there was going to be a war between Gangster Disciples and Black Disciples...That meant they were going to start shooting." This conversation took place outside 3542 South State and included Narvel Salter, Mario Bailey, Dwight Peal, and two others. All of them were in the lobby shortly after the conversation, with defendant sitting on a crate.

"Q. Were you working security for this?

A. Not really. Not really. But I was around there so I just did it... When you work security aint no sitting down. Supposed to stand by the door.

Q. What does it mean to work security?

A. Like call out when the police come. And like since it was already tension between Black Disciples and Gangster Disciples, you had all Black Disciples break theirself; that means they got to raise their shirt up and show [if they had a gun].

* * *

Narvel had a gun...He was playing with it. Like, man, if they come out, we are going to get them, you know what I am saying.

Q. What did you interpret that to mean?

A. That he was going to kill somebody.

* * *

Q. Once [victim] came into the building, what happened?

A. When he came in the building the first people I told—I was getting ready to tell him to break himself, but he already broke himself. [He was not armed].

* * *

Q. If he had not broken himself or lifted up his shirt, would you have asked him to break himself?

A. Yes.

Q. Once he did that what happened next?

A. Narvel followed him. And Narvel and Dwight came, and then it was just two shots.

Q. Do you know if Nu-Nu is in a gang?

A. Yes.

Q. What gang is he in?

A. I think they said he is minister of the Black Disciples.

Q. Does minister mean that he has rank in the Black Disciples?

A. Yes.

Q. Do you know if Narvel has any rank in your gang?

A. Yes.

Q. What rank does Narvel have in your gang?

A. Coordinator.

Q. What does coordinator mean?

A. He like—he up under the region, so he gets everything together.

Q. So does that mean if there was or there is a war, that he would put togther what needs to be done?

A. Yes.

Q. When Nu-Nu came in the building, did he do anything or say anything?

A. He looked like you know, he like wary. He didn't look like— because usually when he came to the building, he have a lot of guys around. He came by himself.

Q. Do you know why he always comes to that building?

A. Because his girlfriend lives in that building.

Q. Once he lifted up his shirt and didn't show anything, where did he go?

A. It looked like he was going up to his girlfriend's house, but he didn't get a chance to make it. Because as soon as he turn the corner, right behind the mailbox room, that is where he got killed.

Q. As he turned the corner then tell me what happened?

A. As he turned the corner Narvel followed him. And it was just like two shots. Everybody was going to follow him, right.

Q. Why was everybody going to follow him?

A. Because he is a coordinator and we got to watch. So when I heard the two shots, Speedy ran out the building, out the front door, and I ran up the stairs, just ran.

* * *

Q. Let me stop you right there. Before you ran, though, did you see Narvel with a gun?

A. Yes.

Q. Where did you see Narvel with a gun?

A. Like standing over Nu-Nu; not over him but right by him, you know.

Q. What was Narvel doing with the gun?

A. He had just shot him.''

Defendant said that he saw Salter give the gun he had used to another gang member, who took it into another building. That gang member then gave a different gun to the defendant. The defendant hid this gun under his mother's water bed. The defendant lived in the 3542 building.

Defendant's mother testified in a manner consistent with her testimony during the hearing on motion to suppress statements. The defense rested. After closing arguments, the jury found defendant guilty of first degree murder. The court sentenced defendant to 30 years in the Illinois Department of Corrections. The court reconsidered the sentence and imposed a 25-year sentence. Defendant timely appeals.

Defendant first argues that his statements should have been suppressed because police efforts to notify his mother of his whereabouts were insufficient, a youth officer was not present until eight hours after his arrest, and the youth officer expressed no interest in safeguarding his rights.

●1 In reviewing whether a defendant's confession was voluntary, courts of review will accord great deference to the trial court's factual findings, and we will reverse these findings only if they are against the manifest weight of the evidence. However, we review *de novo* the ultimate question of whether the confession was voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000).

●2 At the time respondent was questioned, section 5—6(2) of the Juvenile Court Act provided:

"A law enforcement officer who takes a minor into custody without a warrant under Section 5—5 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5—6(2) (West 1996).

●3 In determining whether a juvenile's confession is voluntary, a court looks to the totality of the circumstances. *In re G.O.*, 191 Ill. 2d at 54; *People v. McNeal*, 298 Ill. App. 3d 379, 390 (1998). Factors to

consider include the respondent's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996).

When a juvenile is involved, the courts should also consider the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare. *In re L.L.*, 295 Ill. App. 3d 594, 600-01 (1998). No single factor is dispositive. *People v. Gilliam*, 172 Ill. 2d at 500. The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession. *People v. Brown*, 169 Ill. 2d 132, 144 (1996). In making this determination, courts must consider the characteristics of the accused as well as the details of the interrogation. *In re M.W.*, 314 Ill. App. 3d 64, 69 (2000).

●4 Applying all of these factors, we find that defendant's statements were voluntary. After determining that the defendant was 15 years old, Valadez testified that he discontinued interviewing defendant and only reinitiated the questioning when youth officer Terrell was available. Valadez also testified that he phoned defendant's mother several times, albeit unsuccessfully. The purpose of the notice requirement is to permit, where possible, a parent to confer and counsel with the juvenile before interrogation. *People v. Fuller*, 292 Ill. App. 3d 651, 665 (1997). Here, defendant's mother testified that her neighbor told her that the police had picked up her son and taken him to Area One. She further testified that she did not go to Area One, approximately 15 blocks from her home, nor did she phone Area One.

In this appeal, defendant focuses most of his argument on the assertion that the youth officer's failure to actively protect his rights was a basis for suppressing his statements. Defendant cites the holdings in *In re J.J.C.*, 294 Ill. App. 3d 227, 237 (1998), *In re L.L.*, 295 Ill. App. 3d 594, 603 (1998), and *In re G.O.*, 304 Ill. App. 3d 719, 733 (1999). All three of these cases held that where the youth officer failed to demonstrate an interest in the juvenile's welfare, the statutory purpose behind the requirement that a youth officer be notified was defeated. These decisions were criticized in *People v. Plummer*, 306 Ill. App. 3d 574, 586-87 (1999), and *People v. Hardaway*, 307 Ill. App. 3d 592, 607-08 (1999). More importantly, our supreme court reversed the appellate court in *In re G.O.*, 191 Ill. 2d 37 (2000). The dissent in *In re G.O.* specifically asserted that where youth officers do not offer genuine help to the juvenile, their mere presence should not be considered

as a factor supporting the admissibility of the juvenile confession. *In re G.O.*, 191 Ill. 2d at 70-71 (McMorrow, J., dissenting).

In the instant case, Valadez testified that Terrell was present for all interviews with defendant, that Valadez read defendant his *Miranda* rights in the presence of Terrell and Terrell asked defendant "basic information." In his motion to suppress, defendant did not allege coercion. In the court-reported confession read to the jury, the defendant said he understood his rights under *Miranda*, that he understood he would be tried and sentenced as an adult, and that he was treated well by the police. Assistant State's Attorney Oppenheimer testified that he spoke to defendant outside the presence of the police and defendant said he was treated well by the police. Under the totality of the circumstances, we find that defendant's statements were voluntary.

•5 Defendant next argues that the trial court erred in allowing Detective Bloore to testify regarding the structure of the Gangster Disciples street gang and the history of that gang's relationship with the Black Disciples street gang.

We employ a three-part analysis to determine this issue: (1) whether Detective Bloore's testimony qualifies as an expert's opinion; (2) if it does, is the testimony relevant?; and (3) does the prejudicial effect of the testimony outweigh its probative value? *People v. Clifton*, 321 Ill. App. 3d 707, 719 (2000); *People v. Davenport*, 301 Ill. App. 3d 143, 150 (1998), citing *People v. Jackson*, 145 Ill. App. 3d 626, 633 (1986); see also *People v. Cruzado*, 299 Ill. App. 3d 131, 141 (1998).

Defendant does not dispute that Bloore's testimony qualifies as expert opinion. He argues that it was cumulative to Fannie Branch's testimony that the Gangster Disciples and Black Disciples did not "get along," that the 3542-44 building was controlled by the Gangster Disciples and Salter told her that the treaty between the Gangster Disciples and Black Disciples had been broken and there was a war. The trial court could have reasonably concluded that Bloore's knowledge about the detailed hierarchy and activities of the two street gangs was superior to that of Branch. See *People v. Davenport*, 301 Ill. App. 3d at 150 (holding that allowing Detective Bloore to testify as an expert was not error).

Defendant argues that Bloore's testimony was irrelevant and was only offered to inflame the jury. It is within the discretion of the trial court to determine whether evidence is relevant and admissible, and a reviewing court will not reverse the trial court's determination absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Pursley*, 284 Ill. App. 3d 597, 604 (1996). Similarly, a trial court's decision to admit gang evidence will not be overturned on

appeal absent a clear abuse of discretion. *People v. Gonzalez*, 142 Ill. 2d 481, 489-90 (1991); *People v. Colon*, 162 Ill. 2d 23, 30 (1994).

Our supreme court and our appellate court have acknowledged that there may be a strong prejudice against street gangs. *People v. Strain*, 194 Ill. 2d 467, 477 (2000), citing *People v. Patterson*, 154 Ill. 2d 414, 458 (1992); *People v. Smith*, 141 Ill. 2d 40, 58 (1990); *People v. Pogue*, 312 Ill. App. 3d 719, 727 (1999); *People v. Jimenez*, 284 Ill. App. 3d 908, 912 (1996). In spite of this prejudice, gang-related evidence will not necessarily be excluded if it is relevant and admissible. *People v. Gonzalez*, 142 Ill. 2d at 489; *People v. Davenport*, 301 Ill. App. 3d at 150. Relevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence. *People v. Gonzalez*, 142 Ill. 2d at 487-88.

Gang-related evidence is admissible to show that the defendant acted with a common purpose or was part of a common criminal design, or to provide a motive for an otherwise inexplicable act. *People v. Smith*, 141 Ill. 2d at 58; *People v. Clifton*, 321 Ill. App. 3d at 722. Gang-related evidence is also relevant to the issue of identification or to corroborate a defendant's confession. *People v. Gonzalez*, 142 Ill. 2d at 488; *People v. Davenport*, 301 Ill. App. 3d at 151. However, such evidence must be related to the crime charged. *People v. Strain*, 194 Ill. 2d 467, 477 (2000); *People v. Joya*, 319 Ill. App. 370, 375 (2001).

The defendant cites *People v. Mason*, 274 Ill. App. 3d 715 (1995), as support for his position. In *Mason*, the defendant and the murder victim were both Gangster Disciples. The trial court allowed the State to introduce gang-specialist testimony to support its theory of motive, which was that a superior member of the gang ordered the defendant to kill the victim because of a fear that the victim had become an informer.

This court held that while the testimony regarding the structure of the gang was relevant to the State's theory of motive, testimony regarding gang rivalries, tattoos and drug sales was not relevant. *Mason*, 274 Ill. App. 3d at 722. This court also found error in the State's argument that photographs of the defendant's tattoos showed that the defendant was proud of his gang membership, rather than arguing that the tattoos showed defendant was a member of a gang, which would have been proper. *Mason*, 274 Ill. App. 3d at 723. This court held that the defendant was denied a fair trial where much of the gang-crime testimony was irrelevant, inflammatory and excessive.

The State responds that the Illinois Supreme Court allowed evidence of gang structure and history in *People v. Lucas*, 151 Ill. 2d 461, 488-89 (1992). There the trial court allowed an expert witness to

testify as to the inception and development of the Black Gangster Disciples from the 1960s to the time the crime was committed, and also described the types of criminal activity the gang was involved in. The supreme court held that the trial court properly exercised its discretion in admitting the evidence as it was relevant to the crime charged (the murder of a prison official) and this consideration outweighed the testimony's prejudicial effect.

In *People v. Fort*, 248 Ill. App. 3d 301, 315 (1993), this court upheld the admission of a police officer's testimony about the history and structure of the defendant's and victim's gangs. We noted that since the evidence suggested that the victim's killing was motivated by a feud between the defendant's and victim's gangs, testimony regarding the defendant's gang's infrastructure and history was relevant to show the defendant's knowledge and involvement in the murder.

In *People v. Davenport*, 301 Ill. App. 3d 143 (1998), this court affirmed Bloore's testimony relating the history and structure of the Black P. Stone Nation street gang (the Stones) and that of the Gangster Disciples. This testimony included the meaning of gang symbols and tattoos and the boundaries of the gangs' respective territories. It also included the fact that a soldier in a street gang may be "violated" for failure to obey an order of a higher-up. In *Davenport*, a member of the Stones had shot and killed a person the defendant thought was a Gangster Disciple. This court found Bloore's testimony regarding the hierarchy of the defendant's gang was relevant to explain an otherwise inexplicable act and to establish a motive for the shooting. This court also found Bloore's testimony regarding the rivalry between the gangs, the boundaries between the gangs, and the tactics of "false flagging" to be relevant and admissible. *Davenport*, 301 Ill. App. 3d at 151. However, this court found Bloore's testimony regarding the background, history and criminal activity of the two gangs to be "far more troublesome, as it is peripheral to the offense at issue." *Davenport*, 301 Ill. App. 3d at 151-52. In affirming, this court relied upon the extremely deferential standard of review.

In the instant case, we find that Bloore's testimony was properly admissible. Defendant concedes that the jury needed to be informed of the structure of the Gangster Disciples at least so far as the fact that coordinators, like Narvel Salter, may give orders to soldiers, like defendant. We find Bloore's testimony regarding the structure of the Gangster Disciples to be relevant because, in his court-reported statement, defendant said there was a meeting of the "board" earlier on July 12, 1996, and that he was told there was going to be a "war" between the Gangster Disciples and Black Disciples. He explained that Salter was a "coordinator," who was under the "region," and that, as

a "soldier," he, defendant, "do[es] what the people with the rank tell [him] to do." Defendant stated that Black Disciples had to "break" when they entered 3542-44 and that the victim was a minister of the Black Disciples. Defendant further stated that he and the others had to follow Salter when he shot the victim "because he is a coordinator and we got to watch." As to the testimony regarding the history of the Gangster Disciples and Black Disciples, we find that under the particular facts of this case, where members of the Gangster Disciples shot a minister of the Black Disciples after a truce was called off, it was relevant. Unlike the facts in *Davenport*, where members of the Black P Stone Nation street gang shot someone they believed to be a Gangster Disciple, here, the Gangster Disciples and the Black Disciples share common history. Testimony regarding the split up of the Black Gangster Disciples into the Black Disciples and Gangster Disciples was relevant to explain the source of friction between the two gangs.

Based on the particular facts of this case, especially defendant's statement in which he describes how the orders regarding the "war" come form the gang's "board," were relayed to "coordinators," who relayed them to "soldiers," we find Bloore's testimony regarding the structure of the gangs was properly admissible in the exercise of the trial court's discretion. " 'An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation. [Citation.]' " *People v. Gonzalez*, 142 Ill. 2d at 489.

●6 Finally, defendant argues that the evidence was insufficient to prove him guilty where he asserts he was merely present at the time of the offense and did not participate in the shooting. When reviewing the sufficiency of the evidence in a criminal case, the relevant question is whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Brown*, 169 Ill. 2d 132, 152 (1996). The verdict "will not be overturned unless [it is] so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt." *Brown*, 169 Ill. 2d at 152. Furthermore, the trier of fact bears the responsibility of determining the credibility of the witnesses, the weight to be given their testimony, and reasonable inferences to be drawn from the evidence presented. *People v. Bofman*, 283 Ill. App. 3d 546, 553 (1996). It is not the function of the reviewing court to retry the defendant or to substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses and the weight of the evidence. *People v. Mullen*, 313 Ill. App. 3d 718, 724 (2000).

●7 Under Illinois law, a defendant is legally accountable for the

conduct of another person if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1996).

•8 The accountability statute requires that, for a person to be legally accountable for the criminal acts of another, he must solicit, aid, abet, agree or attempt to aid the criminal acts of another. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence that proves beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal; or (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d at 266. Intent may be inferred from the character of the defendant's actions and from the circumstances surrounding the commission of the offense. *People v. Perez*, 189 Ill. 2d at 266.

•9 "The common [criminal] design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by [any] one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *People v. Perez*, 189 Ill 2d at 267. "Further, proof of the common purpose need not be supported by words of agreement or direct evidence, but can be drawn from the circumstances surrounding the commission of an act by a group." *People v. Basden*, 264 Ill. App. 3d 530, 548 (1994). Evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995).

•10 As previously stated, evidence indicating that the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or common criminal design. *People v. Smith*, 141 Ill. 2d at 58; *People v. Davenport*, 301 Ill. App. 3d at 151; *People v. Cruzado*, 299 Ill. App. 3d at 142; *People v. Clifton*, 321 Ill. App. 3d at 722.

•11 However, a defendant's mere presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability. *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). Nevertheless, active participation in an offense has never been a requirement for the imposition of criminal guilt under an accountability theory. *People v. McComb*, 312 Ill. App. 3d 589, 593 (2000). "One may aid and abet without actively

participating in the overt act." *People v. Taylor*, 164 Ill. 2d at 140. Thus, accountability may be established through a person's knowledge of and participation in the criminal scheme even though there is no evidence that he directly participated in the criminal act itself. *In re W.C.*, 167 Ill. 2d 307, 338 (1995).

●12 Factors that may be considered by the jury, and which may raise an inference that an accused aided in the commission of a crime, include: "(1) defendant's presence during the planning of the crime; (2) defendant's presence at the scene of the crime without any negative reactions to it; (3) acceptance of illegal proceeds from the actual perpetrator; (4) flight from the scene, especially after the victim has been injured or killed; (5) failure to report the incident; and (6) defendant's continued association with the perpetrator after the criminal act." *People v. Walker*, 230 Ill. App. 3d 377, 388 (1992).

●13 Applying the above case law to the facts of this case, it is clear that "defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design." This supports an inference that he shared the group's common purpose and his conviction for the murder committed by Salter may be sustained on this ground. *People v. Taylor*, 164 Ill. 2d at 141.

In assessing the six factors that raise an inference that an accused aided in the commission of a crime, we find: (1) Defendant was present during the planning of the crime—defendant told the authorities that he knew that the Gangster Disciples "board" had met and that a "war" was on; prior to the shooting, defendant saw Salter in the lobby with a gun and Salter said "if they come out, we are going to get them," which defendant knew meant that Salter was going to kill somebody. (2) Defendant was present at the scene of the crime, and not only did he not have any negative reaction to it, he said he was going to tell Webb to "break" when he did so on his own, and if Webb had not done so, defendant would have told him to. This was done at a time when he knew Salter intended to kill a Black Disciple. Defendant knew Webb was a ranking member of the Black Disciples and he frequented the building at 3542-44. Defendant followed Salter as he followed Webb around the corner. Defendant said he did this because Salter was a coordinator and the soldiers had to watch. (3) While defendant did not accept illegal proceeds from the actual perpetrator, he did hide a gun (although not the murder weapon) he was given by another gang member immediately after the shooting. (4) Defendant did run from the scene after the victim was killed. (5) Defendant failed to report the incident. (6) Defendant continued to associate with the perpetrators after the criminal act. He hid a gun and saw others take the victim's shoe. The only factor arguably not present was defendant

accepting illegal proceeds from the perpetrator, but this was a murder, not an armed robbery or theft.

In B. Max, *Criminal Accountability and ("Mere Presence") in Illinois*, 89 Ill. B.J. 248 (2001), the author, Assistant Public Defender Brendan Max, discussed recent Illinois cases addressing the issues of mere presence in cases premised upon accountability. After an excellent discussion of recent case law, Max suggests that there are better indicators upon which to determine accountability than those previously mentioned.

The first reliable additional indicator would be whether the defendant confessed to participation. Max asserts that a confession will relieve the trier of fact of having to consider which inference should be drawn from the facts presented. As can be seen by the facts in the case *sub judice*, while confessions are strong direct evidence, what inferences may be drawn from a confession is often disputed.

The second reliable additional indicator would be whether there was "evidence of the defendant's participation in planning of the crime." Max's suggestion that this factor be limited to instances where the defendant "participated in planning the crime" would limit this factor's applicability to only gang leaders. Here, defendant knew that the Gangster Disciples "board" had met hours before the shooting and there was going to be a "war." He was also present when Salter told the members of the gang that he was going to kill somebody. These facts are more than sufficient to comprise the factor that defendant was present for the planning of the crime.

Max's third reliable additional factor merits strong consideration. He asserts that, in the absence of direct evidence of a defendant's participation in the crime, courts should look to whether the underlying crime was a spontaneous act of the principal. He cites our supreme court's recent decisions in *People v. Taylor*, 186 Ill. 2d 439 (1999), and *People v. Dennis*, 181 Ill. 2d 87 (1998).

In *Taylor*, the court held that the defendant driver was not accountable for the criminal acts of his passenger. The defendant knew his passenger was armed. While driving down the street, the defendant's car almost hit another car. The passenger jumped out of the defendant's car and got into a shouting match with the occupants of the other car. He then fired a shot at them, jumped back into the defendant's car, and the defendant sped away. A jury found the defendant accountable for the shooting. In reversing, the supreme court focused on the spontaneous nature of the crime.

In *Dennis*, the defendant drove a friend to an area where drugs were sold, in order to purchase narcotics. After being dropped off, the passenger saw two men in an alley and decided to rob them. The pas-

senger then ran back to the defendant's car and defendant sped away. A jury convicted the defendant of armed robbery based on accountability and the supreme court reversed. As in *Taylor*, the crime was a spontaneous event. Because the robbery was spontaneous, the defendant could not have had the intent to assist in the robbery when he drove the principal to the drug house.

As a defendant should not be held accountable for the spontaneous act of the principal, whether the principal's crime was a spontaneous act is a proper factor to consider when determining whether another person should be held legally responsible for the principal's actions.

This last factor is of no assistance to the defendant in this case. The murder of Webb was certainly not a spontaneous act on the part of Salter and Bailey. The evidence was overwhelming that defendant had knowledge of the common criminal design to kill Webb.

For all of the above stated reasons, we affirm defendant's conviction and sentence for first degree murder.

Affirmed.

THEIS, J., concurs.

JUSTICE REID, dissenting:

I dissent. To paraphrase the definition in Black's Law Dictionary, *mens rea*, which in Latin means "the guilty mind" is defined as the state of mind that the prosecution must prove that a defendant had when committing a crime in order to secure a conviction. Black's Law Dictionary 999 (7th ed. 1999). It can be shown as either criminal intent or recklessness. *Mens rea* is the second of two essential elements of every crime at common law, the other being the *actus reus*, or "the guilty act." The record demonstrates that, without the largely exculpatory statement of defendant Williams, there would be little or no evidence of his involvement other than his being seen outside the building long before the shooting took place. 324 Ill. App. 3d at 426-28.

Williams was convicted of murder under the accountability theory. The issue of accountability is pertinent to cases involving deaths resulting from conflicts between street gangs or informal youth groups. *People v. Horton*, 43 Ill. App. 3d 150 (1976). Under Illinois law, a person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). Conviction

under the accountability theory requires the State to prove its case beyond a reasonable doubt. *People v. Groves*, 294 Ill. App. 3d 570 (1998). One must have the mental state requisite to an offense and aid in its commission in order to be accountable for it. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Mere presence at the scene, with knowledge that a crime is being committed, is insufficient to establish accountability. *In re W.C.*, 167 Ill. 2d at 338. While active participation is not a requirement for conviction under an accountability theory, more than presence at the scene of a crime plus knowledge that a crime is being committed is required. Mere knowledge that a crime is being committed is insufficient to establish aiding and abetting. However, one may aid and abet without actively participating in the overt act. *Taylor*, 164 Ill. 2d at 140. In order to prove that the defendant possessed the intent to promote or facilitate the crime, the State may present evidence that a given defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design. *Taylor*, 164 Ill. 2d at 141. Such evidence would, depending on the facts of the individual case, also support an inference that he shared the common purpose such that one defendant can justifiably be convicted for the offense committed by another. This is not such a case. It is clear that a reasonable doubt remains in this case, as it stretches the limits of believability to conclude, on these particular facts and circumstances, that Williams is responsible for the murder of Andrew Webb.

Williams neither fired the gun that killed Webb nor did he hide it after the crime was committed. Williams is not a higher-up in the Gangster Disciples. He is, at best, a low level soldier who had joined the gang about four months earlier, probably as a self-defense measure for the summer because the gang controlled his high-rise public housing. He was still in high school and was to be in his junior year when school resumed in the fall. He did not participate in the meetings at which the decisions were made by the Gangster Disciples to go to war with the Black Disciples. Since the accountability doctrine requires that the accused actively participate either before or during the commission of the offense, and conspicuously does not mention the accused's activities after the commission of the offense, this court's inquiry is limited. Williams did not participate in the planning of the offense. He was not present at any of the relevant meetings. He also did not have authority to make policy for the gang. When Narvel Salter took out his gun and shot Webb, Williams was among the gang members who were in the lobby of the building, who only heard the shots fired, and who later scattered. Williams ran back to his apartment. The gun used in the shooting was given by the shooter to Black James, who switched it for another gun and brought that new gun to

Williams' apartment. This suggests that, while Williams did come into possession of a gun, he never actually touched the murder weapon. Also, in this case, the scene of the crime is in the building where the defendant resided and it was not unusual for him to be in the lobby of his residence for legitimate purposes. He had every right to be in that lobby without any strained leap of logic that he was there to commit a crime.

When asked why he was in the lobby at the time of the murder, Williams said he was merely "in the lobby *** sitting on a crate." He also indicated he was sitting with his "back lying on the security guard booth." He was then asked leading questions by the assistant State's Attorney who took the statement whether he was working security at the time of the incident. Williams responded, "Not really. But I was around there so I just did it." When asked if the position in which he was sitting was the point where normally people who work security are, Williams responded "when you work security, ain't no sitting down. Supposed to stand by the door." He was not standing by the door.[1]

While Williams, a Gangster Disciple gang member with no rank, was socializing near the official security booth, Andrew Webb came, unarmed, to visit his girlfriend, another resident of the building. "It looked like he was going up to his girlfriend's house, but he didn't get a chance to make it. As soon as he turned the corner, right behind the mailbox room, that is where he got killed."

Williams also argues that the trial court erred in allowing the testimony of the gang crimes expert. He argues that the testimony of the expert was so inflammatory and irrelevant as to outweigh any probative value, since there had already been considerable testimony from Fannie Branch which would tend to establish the fact that there was a gang war going on between the Gangster Disciples and the Black Disciples at the time of this murder. Williams argues that, since he was not a part of the decision-making process to kill Webb, a discussion of the gang hierarchy was completely unnecessary in this trial.

It is within the discretion of the trial court to determine whether evidence is relevant and admissible, and a reviewing court will not reverse the trial court's determination absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Pursley*, 284 Ill. App. 3d 597, 603 (1996).

---

[1] The record shows that his codefendant, Dwight Peal, was standing by the door and clearly the only one pointed out by an eyewitness as working security. Williams was never mentioned by that witness as even being present in the lobby before or at the time of the shooting.

There is a three-part analysis when determining whether the admission of the gang expert testimony is inappropriate. *People v. Davenport*, 301 Ill. App. 3d 143, 150-51 (1998). First, it must be determined whether the person tendered as an expert is in fact an expert. Second, the testimony must be relevant. Finally, does the prejudicial effect outweigh the probative value?

Although a deep and widespread public prejudice may exist against street gangs, gang-related evidence will not necessarily be excluded if it is relevant and admissible. *People v. Gonzalez*, 142 Ill. 2d 481, 489 (1991). Generally, gang-related evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. *People v. Smith*, 141 Ill. 2d 40, 58 (1990). However, such evidence must relate to the crime charged. This is a murder, only connected to Williams based upon his membership in the gang and his presence in the lobby of his home that also turns out to be the scene of the crime. He was neither the shooter nor was he involved in the decision that resulted in the shooting. Here we have a 15 year old who was simply there at the time the victim was killed, not someone looking to make a name for himself or advance in the gang hierarchy by the killing. Certain evidence relating to the terminology of the gang hierarchy probably was appropriate, but to bring in alleged narcotics traffic by the gang clearly was too prejudicial and clearly outweighed any possible probative value to have been allowed by the trial judge. Because this case is so closely balanced I would have found the admission of the testimony of the "gang expert" to be plain error. For the majority to have considered the testimony of Detective Bloore, that this 15-year-old relatively new gang member somehow acted with common purpose and common criminal design stretching from the death of Andrew Webb to the gang masterminds currently incarcerated, would be laughable if the practical effect was not such a sad commentary on the state of our high-risk children. The majority has turned its back on certain facts. First, Williams was socializing in the lobby of his place of residence with his friends, not standing guard. Second, at best, his knowledge and input in the decision-making process involving whether the gang would go to war was virtually nonexistent. Did he know the Gangster Disciples and the Black Disciples were at war? Yes, he did, in the same way a private in the United States Army does. That is to say, he knows what he has been told and what he hears from his fellow soldiers. To impute the knowledge of his seniors in the gang to Williams, using the inflammatory testimony of a gang expert to equate Williams and his facts to gang problems in general should, were it not for the obvious bias in favor of getting rid of gangs, shock the conscience. While I generally understand and applaud the efforts

of our legislature, courts and law enforcement to rid our streets of the pestilence of gangs, I cannot in good conscience wear blinders so as to allow the rights of even a single child to be trampled. I believe Charles Williams is that child, or was at time of his arrest and trial. Had he fired the gun, hidden the gun from law enforcement, or even been told specifically that he was to kill or help kill someone, I would not blink an eye when the proverbial book was thrown at him.

Based on the facts of this case, with due deference to the standard of review, while the defendant is guilty of the lapse of judgment which made him join the gang in the first place, assuming he had any real choice in the matter, this court should have had a reasonable doubt of Williams' guilt of the murder of Andrew Webb.